```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3                           —   —   —

     THE UNITED STATES OF AMERICA,
 4
                    Plaintiff,
 5
         vs.                              Case No. 10-20454
 6
     YU QIN and SHANSHAN DU,          Hon. Marianne O. Battani
 7
                    Defendants.
 8    _____/

 9                          MOTION HEARING

10          BEFORE THE HONORABLE MARIANNE O. BATTANI
                   United States District Judge
11          Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
12                      Detroit, Michigan
                   Thursday, January 20, 2011
13

14   APPEARANCES:

15   For the Plaintiff:    CATHLEEN M. CORKEN
                           STANLEY J. JANICE
16                         U.S. Department of Justice
                           211 W. Fort St., Ste. 2001
17                         Detroit, MI  48226
                           (313) 226-9100
18
     For the Defendants:   FRANK D. EAMAN
19                         645 Griswold St., Ste. 3060
                           Detroit, MI  48226
20                         (313) 962-7210
                             on behalf of Yu Qin
21
                           ROBERT M. MORGAN
22                         615 Griswold St., Ste. 1125
                           Detroit, MI  48226
23                         (313) 961-7070
                             on behalf of Shanshan Du
24
         To obtain a copy of this official transcript, contact:
25            Robert L. Smith, Official Court Reporter
              (313) 964-3303 • rob_smith@mied.uscourts.gov
```

Motion Hearing - January 20, 2011

# TABLE OF CONTENTS

                                                                    Page

WAIVER OF DEFENDANTS APPEARANCE...................   4


MOTION TO DISMISS INDICTMENT

Motion by Mr. Eaman................................   5

Reply by Ms. Corken...............................   7

Response by Mr. Eaman.............................   9

Ruling by the Court...............................   9


MOTION TO SUPPRESS EVIDENCE

Motion by Mr. Eaman............................... 12

Reply by Ms. Corken............................... 29

Response by Mr. Eaman............................. 46

1    Detroit, Michigan

2    Thursday, January 20, 2011

3    at about 10:15 a.m.

4                            —   —   —

5             (Court and Counsel present.)

6             THE DEPUTY CLERK:  All rise.

7             The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Marianne O. Battani presiding.

10             You may be seated.

11             This is United States vs. Yu Qin and Shanshan Du.

12             THE COURT:  Good morning.

13             MS. CORKEN:  Good morning, Your Honor.

14    Cathleen Corken on behalf of the United States.

15             MR. JANICE:  And Lee Janice on behalf of the

16    U.S. Attorney's Office also.

17             MR. EAMAN:  Good morning, Your Honor.  Frank Eaman

18    on behalf of the Defendant, Yu Qin.

19             MR. MORGAN:  Good morning, Judge.  Robert Morgan

20    appearing on behalf of Shanshan Du.

21             THE COURT: All right.  You may be seated.  All

22    right.  Your clients are not here?

23             MR. EAMAN:  No, Your Honor.  We checked with the

24    Court and --

25             THE COURT:  They don't have to be here if they know

Motion Hearing - January 20, 2011

**4**

1   and agree.

2   　　　　MR. EAMAN:  We advised them of the motion hearing,

3   we advised them that their attendance was not mandatory, and

4   we advised them that we didn't need them here, and they

5   consented to proceeding in their absence.

6   　　　　THE COURT:  All right.  There are a couple of the

7   motions that I think are basically agreed.  The defense has a

8   motion for 404(B) evidence.

9   　　　　MR. EAMAN:  Request for 404(B) notice, yes, Your

10  Honor.

11  　　　　THE COURT:  Okay.  And the Government is aware of

12  that?

13  　　　　MS. CORKEN:  Yes, Your Honor.  We will provide that

14  notice reasonably in advance of trial.

15  　　　　THE COURT:  Okay.

16  　　　　MR. EAMAN:  There is no motion date set for motions

17  in limine in this case.  We would only ask that the

18  Government provide that notice before the motion in limine

19  date, if the Court sets one, so that we have an opportunity

20  to address any 404(B) evidence in a motion in limine.

21  　　　　THE COURT:  Any problem with that?

22  　　　　MS. CORKEN:  No problem, Your Honor.

23  　　　　THE COURT:  Okay.

24  　　　　MR. EAMAN:  Thank you.

25  　　　　THE COURT:  Then the motion to strike surplusage, I

1    guess the a/k/a's.

2           MR. EAMAN:  Yes.  The Government has agreed that

3    the indictment itself will redact the a/k/a's provided that

4    we stipulate that Shanshan Du is also sometimes known as

5    Shannon, and also Yu Qin is -- the pronunciation of Q-I-N is

6    Chin.  I believe that is the stipulation of the Government.

7           MS. CORKEN:  That's right, Your Honor.

8           THE COURT:  All right.

9           MR. EAMAN:  Thank you.

10          THE COURT:  Then I have a motion to suppress

11   evidence and a motion to dismiss the indictment, and included

12   within that motion is a request for an evidentiary hearing.

13   Let's take that motion first.  Who wants to argue that?

14          MR. EAMAN:  I'm going to argue the motion to

15   suppress on behalf of both myself and Mr. Morgan.

16          THE COURT:  The motion to suppress?

17          MR. EAMAN:  Did you say -- which motion did you

18   say?

19          THE COURT:  The motion to dismiss the indictment,

20   but I have no problem with doing the suppress first.

21          MR. EAMAN:  Oh, no, I will proceed with that first.

22   That's fine.  I will also argue for both Defendants, if I

23   may?

24          THE COURT:  Okay.  Thank you.

25          MR. EAMAN:  The motion to dismiss is simply based

1    on a delay in this case.  In the Government's response they

2    indicate there are some legitimate reasons for delay; one is

3    reconstructing torn-up evidence, and the other one is a

4    privilege review.  We would only point out to the Court that

5    that does not consume all of the time of the delay here, only

6    a portion of the time.  The Government did delay this

7    indictment for a substantial period of time, not all of which

8    was consumed by showings they've made.

9         As to whether witnesses -- important witnesses have

10   been lost, they allege that, for instance, one witness, I

11   think Randy Meng, M-E-N-G, would have been a witness for the

12   Government.  We can argue back and forth about that.  I think

13   he would have been a helpful witness for the defense as well.

14        THE COURT:  The biggest thing is he apparently was

15   gone before the --

16        MR. EAMAN:  Well, he was, but, you know, we might

17   have been able to try to track him down or find him or follow

18   him if we had thought he would have been a witness and at

19   least get a statement from him and find out what is

20   happening, but in limbo with no charges filed we are now

21   facing an indictment with that problem.

22        And as to Mr. Jiang they said -- the Government has

23   more access to travel information than we do, especially for

24   people who are not United States citizens or people who

25   travel internationally who are United States citizens, so we

1    are unaware of contact information for Mr. Jiang.  If the

2    Government could provide that to us that would be helpful,

3    but that's all I'm going to say regarding the motion to

4    dismiss, Your Honor.

5           THE COURT:  Okay.  Government?

6           MS. CORKEN:  Yes.  Your Honor, just very briefly.

7    In order to prevail on their motion to dismiss the defense

8    needs to show that the delay was an intentional devise

9    employed by the Government as a tactic basically, and,

10   second, that they suffered actual and substantial prejudice

11   as a result of the delay.  Their motion fails on both of

12   those points.

13          With respect to prejudice, as the Court has pointed

14   out, Mr. Meng left the country before the FBI even began

15   their investigation.  And with respect to Mr. Jiang, travel

16   records do indicate that he is, in fact, available, that he

17   travels very frequently to the United States, and has been

18   back in the United States some 15 times since August of 2005.

19          There's certainly no showing that any delay was

20   intentional on the part of the Government, or that it was a

21   devise that was employed to obtain any kind of tactical

22   advantage.  There are certainly more reasons that we lay out

23   in our response to the motion to dismiss that account for the

24   delay than the two reasons cited by the defense.  It wasn't

25   just the tainting process, which was a lengthy process,

1    involved many steps, and it wasn't just the piecing together

2    of the hundreds of shredded documents.  The additional

3    reasons related to the nature of the investigation which was

4    incredibly complex and involved not only investigation into

5    the Defendants' conduct with respect to theft of GM trade

6    secrets but also of trade secrets belonging to the Control

7    Power Company, and both aspects of the investigation were

8    extremely time consuming.

9            As the Court is, I'm sure, aware it is a very

10   technical case, the documents are very technical, and so

11   every step of the way the investigators had to work in tandem

12   with the relevant engineers.

13           There were also multiple computers that were seized

14   at the time of the search warrant as well as numerous

15   electronic devices, and there are hundreds of gigabytes of

16   information on those devices and computers.  All of that

17   information had to be reviewed, again, in conjunction with

18   engineers.

19           And in addition there are -- there were extensive

20   investigative efforts that were directed toward potential

21   charges that were not ultimately brought, for instance,

22   violations of the Economic Espionage Act.  So that aspect of

23   the investigation involved obtaining and reviewing numerous

24   financial records, for instance, as well as reviewing all of

25   the e-mails in multiple e-mail accounts of the Defendants.

1   So there were a number of reasons that account for

2 the delay but the bottom line is that the defense has not

3 shown that there was any intent on the part of the Government

4 to lengthen the investigation to obtain a tactical advantage,

5 and certainly there is no showing of any actual substantial

6 prejudice as a result of that delay.

7   THE COURT:  Okay.

8   MR. EAMAN:  Just a brief response, Your Honor.  In

9 terms of the computer information or forensic analysis, I

10 note the search warrant affidavit was signed May 19th, 2006,

11 and it contained all kinds of information about e-mails and

12 computer information, so we stand on our position that there

13 are only two legitimate reasons disclosed by the Government

14 for this delay.

15   THE COURT:  All right.  The Court has read the

16 briefs that have been submitted in this matter and I have, of

17 course, listened to the argument here this morning.  And in

18 reviewing this -- well, first of all, the Defendant ask -- I

19 will speak when I say Defendant both Defendants because they

20 have joined in this motion.  The Defendants have asked for an

21 evidentiary hearing on this matter, and the Court denies the

22 request for evidentiary hearing because I think that there

23 has been insufficient factual development to show that a

24 hearing is necessary.

25   The Sixth Circuit has established a standard to

1    dismiss for pre-indictment delay, and that is that the

2    defendant has the obligation to show substantial prejudice to

3    the presentation of his defense, and he also has the

4    obligation to show that the delay was an intentional devise

5    by the Government to gain a tactical advantage.

6          In terms of showing actual prejudice as has been

7    argued, defense argues that there were two witnesses that

8    they no longer believe they have access to.  Well, the one

9    witness had left before, I think, if I'm correct, it was

10   before General Motors referred this matter to the FBI so

11   before this all actually -- the investigation started.

12         Defendant alleges that they could have tried to

13   track down the witness and clearly they could have tried to

14   track down the witness and that probably would have been

15   easier at that time, but that's not sufficient to establish

16   actual prejudice.

17         In terms of the other witness, the Government

18   indicates that he has traveled to the United States some 15

19   times since the end of August 2005 and therefore is most

20   likely available to the Defendant, and the Court would

21   require the Government to verify this to the Defendant by

22   just submitting the records that you have in terms of his

23   travel, not necessarily all of the records, I simply mean to

24   show that he has come into the United States this many times.

25         The second -- so I believe that the Defendant has

1    failed to show substantial prejudice.  And I should go back

2    and say that this case is within the statute of limitations,

3    there is no question about that, and that has not been

4    questioned by the Defendants.

5         The Court is most bothered in these cases when it

6    seems to me that the Defendants are led to a certain degree

7    of comfort that nothing is going to happen in the case

8    because nothing happens for a number of years.  In this case,

9    clearly because of the technical nature of this case much has

10   happened since the Complaint was dismissed, and there is no

11   dispute that the Complaint was dismissed without prejudice in

12   order for the Government to continue with its investigation

13   and not violate a speedy trial demand.

14        The Court finds that in August of '06 the parties,

15   and this again is not contested, stipulated to tainting

16   procedures to review the evidence.  There was discussion at

17   that time regarding a certain program that was to be used.

18   That program evidently took some time but the defense had

19   the -- evidently had the program and reviewed these disks,

20   but it didn't use that program according to the Defendants,

21   the procedure, the FTK procedure, but it did take a couple of

22   years before they were able to provide the results to the

23   Government.  The Government then required them pursuant to

24   the agreement to use the FTK procedure and so it had to go

25   back, and all of this technicality went back and forth for a

1    number of years, and so the Defendants were well aware that

2    this case was proceeding but it was proceeding at a rather

3    slow pace, and I say slow in chronological time because I do

4    not know that it is slow in terms of computer time or the

5    time necessary to process this information.

6         Also, the Government, as has been referenced,

7    though I'm not actually sure of the date of this, but I think

8    it is added only to show the technical difficulty is that the

9    Government put back together a bag -- a plastic bag full of

10   shredded documents, and that took some, I believe, 15 months

11   or so.

12        So the Court finds that there has been no showing

13   at all that the delay was an intentional devise by the

14   Government to gain a tactical advantage, and therefore the

15   Court denies the motion to dismiss the indictment and for

16   evidentiary hearing.

17        All right.  The motion to suppress.  Mr. Eaman?

18        MR. EAMAN:  Again, Your Honor, I will argue that on

19   behalf of Mr. Morgan and both Defendants, if the Court

20   please?

21        THE COURT:  All right.

22        MR. EAMAN:  There are several prongs of this

23   motion, three principal ones, but before I get into the

24   merits of those three prongs I just want to give a little

25   background.  I think the Court has been able to glean from

```
 1    the various motions and the indictment in this case that what
 2    happened in this case was that Mr. Qin was an employee at
 3    CPC Company, and that he was called into an office and
 4    challenged on the fact that he operated a company called
 5    Millennium Technologies that appeared to CPC to be in
 6    competition with CPC.  That meeting occurred at a time when
 7    he was working at the CPC offices, and he had left in his
 8    office a backpack and a hard drive.  He was removed from the
 9    building, and CPC recovered the backpack and the hard drive.
10    The backpack -- the hard drive was not in the backpack, but
11    the hard drive was accessed by CPC.  What was in the
12    backpack, and I advised the Government today that we have
13    documents to support this but we haven't put this in our
14    allegation so far, what was in the backpack was some cash
15    which Mr. Qin found it necessary to call somebody to retrieve
16    that backpack because he contends he was going to be escorted
17    out of the building and he wanted to make sure that backpack
18    was safely removed so that the cash would be safe.  The cash
19    was eventually returned by CPC.  The person he called did not
20    retrieve the backpack or the hard drive from the office.
21              THE COURT:  How much cash was in it?
22              MR. EAMAN:  $4,700.  CPC then in looking at the
23    documents on the hard drive and in looking at documents on
24    Qin's computer at CPC and --
25              THE COURT:  Are you talking about a hard drive
```

1   separate from this disk that we are talking about or no?

2           MR. EAMAN:  Separate from --

3           THE COURT:  From a disk when you talk about --

4           MR. EAMAN:  No.  It is -- it was, I think, a

5   160-gigabyte hard drive so it was a block type item that was

6   in his office at CPC.  In looking at that -- and also they

7   escorted Mr. Qin home and asked him to turn over his CPC

8   laptop, which he did.

9           In looking at these various documents they

10  discovered that on the documents were some GM files in a

11  Shanshan directory.  As a result of discovering these GM

12  documents, and I don't have the exact chronology of how this

13  happened, but GM was notified, the Government was notified,

14  and the investigation then began.

15          THE COURT:  They found the GM documents on the hard

16  drive --

17          MR. EAMAN:  Correct.

18          THE COURT:  -- right?

19          MR. EAMAN:  Correct.

20          THE COURT:  What about on the laptop, was there any

21  reference to --

22          MR. EAMAN:  I don't remember.  One second.  Yeah,

23  they were on the laptop, Your Honor.  My law clerk is here

24  and he's done a lot of the computer analysis so I had to ask

25  him that question.

Motion Hearing - January 20, 2011

```
 1            THE COURT:  I've read it too but at this point I
 2   have forgotten where.
 3            MR. EAMAN:  I have too.
 4            THE COURT:  So you are saying the GM documents were
 5   on the laptop, not the hard drive?
 6            MR. EAMAN:  And the hard drive.
 7            THE COURT:  And the hard drive?
 8            MR. EAMAN:  They were on both.  They were on both.
 9            THE COURT:  Okay.
10            MR. EAMAN:  As a result of that then this
11   investigation began, and the agents contacted GM
12   representatives and they prepared this affidavit in support
13   of a search warrant to search two places; one was the -- the
14   two residences of Qin and Du, one that was for sale where
15   they had moved a lot of stuff out but not all of their stuff,
16   and the other was their new residence and the new residence
17   was on Newcastle Drive.
18            The search warrants were executed, and I just note
19   in passing we mentioned in our pleadings that the computers
20   they sought to seize had already been copied by CPC in their
21   civil lawsuit because they sued Qin in Oakland County Circuit
22   Court, and in that lawsuit he turned over computers that were
23   then -- the hard drives were removed and cloned and returned
24   to Qin, so those hard drives had already been in the
25   possession of CPC who was cooperating with the Government.
```

Motion Hearing - January 20, 2011

1      Nonetheless, they got these search warrants to go

2  look for mostly computers and/or documents, and they did

3  seize tremendous amounts of documents as well as computers,

4  drives and other computer devices when they seized.

5      The issues that we raise regarding the sufficiency

6  of the warrant and whether or not there was good faith

7  reliance on the warrant are three.  There is a violation of

8  Franks v. Delaware because the information contained is

9  either intentionally false or reckless -- there is a reckless

10  disregard for what the actual truth is.

11      THE COURT:  Wait a minute.  The information they

12  obtained or you mean the information in the warrant?

13      MR. EAMAN:  The information in the affidavit,

14  right, is either intentionally false or there is reckless

15  disregard for the truth.

16      The second is that there is no probable cause that

17  there was a violation of the Trade Secrets Act because it

18  requires an intent to convert the items.  Possession is not

19  illegal, but possession with intent to convert is, and there

20  clearly was no evidence ascertainable that these documents,

21  though possessed, were -- that there was any intent to

22  convert them to any third party's use.

23      And then the third issue is the lack of probable

24  cause regarding the Newcastle Drive home.

25      I will address them in that order if the Court

1   please.  On the Franks issue the Government responds that the

2   affiant's allegations are based on what he was told by

3   General Motors.  However, as we point out in our reply in

4   support of the motion, some of those allegations which

5   allegedly came from General Motors are not attributed to

6   General Motors in the affidavit.  They are stated by the

7   affiant as the affiant's own conclusions, and the affidavit

8   shows that the affiant was capable of quoting or attributing

9   sources when the information came from sources.  However, he

10  chooses not to do so in some critical allegations in that

11  indictment -- excuse me, in that affidavit.

12          THE COURT:  Do you want to point that out?

13          MR. EAMAN:  Yeah, it is in my reply.

14          THE COURT:  I have your reply right here.

15          MR. EAMAN:  I will look for that.  One second,

16  please.  Page 4 and 5 of the reply, paragraph 37, it is the

17  affiant that states that a General Motors' representative

18  stated a majority -- excuse me.  The affiant does not state

19  that a General Motors' representative stated a majority of

20  the documents were marked confidential but states his own

21  conclusion that a majority of the documents pertaining to the

22  motor controller card, et cetera, were marked as such.

23          And then again referred to on page --

24          THE COURT:  Now, the response or the Government

25  indicates that a number of them were marked as confidential.

1        MR. EAMAN:  Well, there is an issue here about what

2    documents the affiant was referring to.  He doesn't

3    specifically identify the documents as documents -- they say

4    the documents shown to Savagian, the majority of those

5    documents were marked confidential.  As to that allegation

6    the affidavit doesn't say the majority of the documents shown

7    to Savagian were marked confidential.  So we were proceeding

8    on the premise that since the majority of the documents that

9    are charged in the indictment are not marked confidential

10   that the majority of the documents the affiant was referring

11   to were not marked confidential, and that was a false

12   statement.

13        We counted up 14 documents -- we got Savagian's

14   302, the Government has provided us with that.  They use the

15   code to identify the documents so we weren't sure which

16   documents were shown to Savagian, but they gave us the code

17   and we were able to decipher that.  We believe that 14

18   documents were shown to Savagian and only five of those were

19   marked proprietary or confidential, so we don't follow the

20   Government's logic on that at all.

21        We do know, as I say, that many of those documents

22   shown to Savagian, one of whom we were now able to identify

23   called the HPSP code, was shown to Savagian and was marked

24   confidential but is not in the indictment as a trade secret.

25   So there's some confusion about this allegation of the,

1    quote, the majority of the documents were marked

2    confidential.  We don't believe the majority of the documents

3    shown to Savagian were marked confidential and we know the

4    majority of the documents in the indictment are not marked

5    confidential, so we don't know how the Government gets to

6    this conclusion that the majority were marked confidential.

7    We believe that to be a false allegation or certainly a

8    reckless disregard of the truth.

9            I think at an evidentiary hearing that could be

10   cleared up if the Court is inclined to grant an evidentiary

11   on the Franks claim, but perhaps more importantly here we

12   believe that where -- there is an easy investigation that the

13   agent can do to determine whether or not GM is making false

14   allegations that he then just funnels into the affidavit that

15   the failure to corroborate GM's allegations is a reckless

16   disregard of the truth, and there are several allegations of

17   General Motors that were false that he just funneled into the

18   indictment.

19           Obviously, if there is a confidential informant or

20   an anonymous source the affiant has a legal duty to review

21   those allegations, investigate them himself or herself and

22   determine whether or not there is corroboration for those

23   allegations and determine whether or not the person providing

24   the information is reliable.

25           There is no legal duty, strict legal duty, to

1    corroborate or investigate allegations of a citizen but I

2    think none of us want to live in a world where a citizen

3    comes forward and makes allegations about criminal activity

4    on another person and there is no investigation to determine

5    whether or not those allegations are correct or whether or

6    not the person is incorrect or lying or misrepresenting

7    facts.  So we believe that Franks -- to avoid a reckless

8    disregard of the truth, Franks requires some investigation of

9    the allegations made by third persons.

10          A couple of important allegations made by General

11   Motors, some of which, by the way, were retracted later in a

12   subsequent interview of Savagian.  It is important under the

13   Trade Secrets Act whether a person has authorization to have

14   the documents, and there are allegations made in here that

15   Ms. Du had documents she had no authorization for.  An

16   omission is that Savagian, who made these allegations, was

17   not Ms. Du's supervisor.  He was higher up the chain.  He was

18   not supervising her daily work or knew what she needed to do.

19   It would have been a very easy investigative step for the

20   agent or affiant to take to simply get Ms. Du's job

21   description and/or personnel file.  Had he done so he would

22   have seen that in her job evaluation she specifically is

23   evaluated for working on what is called the IGBT and also on

24   simulation programs, two matters that Savagian told the FBI

25   that he didn't think she had a right to have, and yet there

1  was no attempt to corroborate or investigate those

2  allegations, and apparently there was no attempt to talk to

3  her direct supervisor either.

4        And as to CPC falsehoods, the only allegation they

5  make about a trade secret is one source code they say was

6  proprietary but again it would have been an easy

7  investigation to show that source code to any engineer any

8  place who would have said that this source code cannot be

9  proprietary because it is available to the public, it is on

10  the Internet.  So, again, there was no investigation of that

11  allegation of CPC, and that's the only trade secret

12  allegation of CPC.

13        We do indicate that there were allegations that

14  were false that Ms. Du's job performance was not

15  satisfactory.  The Government attempts to rebut that in their

16  response but I think they misunderstand performance

17  evaluations and the percentage shown on the left side of

18  those evaluations has to equal 100, and it is what percentage

19  of your work is being done in those areas, not whether you

20  have -- what you have completed, not what your job

21  performance is.  There is nothing in any performance

22  evaluation of Ms. Du that indicates your job performance is

23  unsatisfactory, you did anything wrong.

24        And I think the Court is probably familiar, buyouts

25  are voluntary.  As the affidavit says, it was a voluntary

Motion Hearing - January 20, 2011

1   buyout that she could have accepted or not.  Had she not

2   accepted the buyout she would have still continued as a GM

3   employee.  So it wasn't a case where she was threatened with

4   termination because of unsatisfactory job performance, it was

5   simply she was selected for a buyout.  Selection of buyout

6   can be for a variety of reasons.  It could be that maybe

7   there is more than needed engineers working on a particular

8   project, but in any case a simple investigation would have

9   produced no corroboration for negative performance

10  evaluations.

11         A key omission that the agent had in this case is

12  when he talked about the documents being marked confidential

13  he neglected to state the General Motors' policy said that a

14  trade secret is supposed to be marked secret and indicated

15  so.  And I think it is attachment C to our motion, page 1317

16  in the Bates-stamped edition that we received from the

17  Government which delineates the difference between secret and

18  confidential.  Confidential is less restrictive.  Secret is

19  it is a trade secret.  He didn't disclose that.  So the

20  marking of confidential may restrict its use but it doesn't

21  designate it as a trade secret.

22         And since an element of the offense of

23  appropriation of a trade secret is that they have to take

24  reasonable steps to protect it the only thing that the

25  affiant lists in the affidavit is they have pass codes, they

 1   have security at the doors.  Every company has that.  We have

 2   that in our small law office.  So those aren't any

 3   extraordinary steps that are taken for protecting of trade

 4   secrets, however, marking them a secret would be, and none of

 5   them were marked secret.

 6        Also in omissions, Du had been confronted -- she

 7   was receiving a buyout when the -- she was confronted with

 8   the fact that CPC documents were present on computers that

 9   Qin had.  She went home and deleted the documents from a

10   drive that she found at home.  She went looking for the

11   documents because she told GM that she inadvertently copied

12   these documents so she deleted them.  She could not delete

13   them from the hard drive or the laptop that Qin had because

14   CPC had that, but she deleted them and she met with a GM

15   representative and apologized and did that.

16        Another omission that we've recently discovered

17   actually in our computer analysis is the documents on both

18   the hard drive, the independent separate hard drive that was

19   in Qin's office, and the laptop were what was called block

20   copied.  In other words, they were all created on those

21   drives or computers at exactly the same time as one does when

22   one creates a backup.  And we -- our computer expert, the

23   Government can dispute this if they wish, but we haven't

24   received any expert reports from them or discovery in that

25   regard yet, there has been -- there was no access to those

1    documents, and that's very simple computer forensic analysis

2    to look at the dates the documents were created to look at

3    whether there was access, but there was none.  So that's an

4    important omission because remember probable cause has to be

5    shown that they intended to convert these items.  Mere

6    possession is not enough.  There has to be an intent to

7    convert.

8         And I disagree with the Government's allegation

9    that just because they were working in the field of hybrid

10   cars and they were electrical engineers is sufficient to show

11   an intent to convert.  Engineers working in hybrid cars

12   sometimes go from company to company, but there is no

13   allegation because that's the field they work in that that's

14   sufficient to show that they intended to convert the items.

15        The probable cause regarding conversion again is

16   not established by possession, but the language that is used

17   in this indictment is something that I haven't seen.  Now,

18   this -- I'm done with the Franks argument, if the Court has

19   any questions on that?

20        THE COURT:  No.

21        MR. EAMAN:  I will move on to the argument about no

22   probable cause about conversion.  The language establishing

23   the intent to convert simply are opinions of people that

24   they, quote, might have been using the documents, that they

25   would be valuable, or they hypothetically provide.  Those are

1    the allegations about that they are to support an intent to

2    use.  They also talk about a 2004 proposal for a hybrid car

3    that Qin was involved with which never got off the ground.

4    And you will note that there are allegations that they

5    reviewed the e-mail accounts of Qin and, again, as a critical

6    omission, which sort of comes back to the Franks issue, there

7    is no allegation in here that in reviewing the e-mail

8    accounts they ever saw that he e-mailed anybody that he

9    intended -- that he had General Motors' hybrid car

10   information or that he ever e-mailed General Motors' hybrid

11   car information.  The only e-mailing about the General

12   Motors' information was between Qin and Du while she worked

13   at General Motors where calculations were exchanged between

14   the two engineers, Qin and Du, who were married to each

15   other.

16          So there is nothing in the affidavit that

17   establishes an intent to convert or send them to anybody else

18   or use them to send to anybody else, so we believe the

19   affidavit failed as to that probable cause, and that an agent

20   in good faith could not have believed that these allegations

21   supported any conclusion that there was probable cause that

22   they intended to convert these items, only that they

23   possessed them.  While that may be a civil infraction in the

24   sense that there may be action that GM could take, it is not

25   a criminal trade secrets violation without the intent to

1    convert.

2            And the third area of argument about the probable

3    cause of Newcastle Drive residence --

4            THE COURT:  This is their new home?

5            MR. EAMAN:  That's their new home.  I think -- we

6    cited in our reply the McPherson (phonetic) case, the Sixth

7    Circuit case, where -- and it is an interesting case.  I

8    thought I had cited it in the main brief but when I looked at

9    the Government's response I had not.  That was a case where a

10   drug dealer was selling -- observed selling drugs in front of

11   the house, and I think a confidential informant who was

12   working with the police actually bought drugs from the

13   defendant in front of his house.  The affiant alleged that he

14   had had a lot of experience in investigating drug dealers,

15   that they frequently sold in front of their house but they

16   kept the drugs in the house, which sounds logical.  They

17   don't have to, of course.  They could keep them in their

18   pockets, they could keep them in their car, but that in his

19   experience they kept them in the house.  They got a search

20   warrant to search his house for drugs based on the

21   observation of selling the drugs outside of the house, and

22   the conclusions -- the law enforcement conclusions that the

23   drugs were being -- that drug dealers kept drugs in the

24   house.

25           The Sixth Circuit said that's not enough.  There

 1    has to be actual particular probable cause as to what is in

 2    the house.  An assumption or a general allegation as to what

 3    is in the house is not sufficient, and that's really what we

 4    have here.

 5              Even in the affidavit and in the Government's

 6    response what we have is that, well, they used to live at

 7    Davis Court and they moved most of their stuff out of there,

 8    although there is one computer at Davis Court and there are

 9    some documents at Davis Court.  They ran their business out

10    of Davis Court.  That was their home.  Davis Court is still

11    the registered address for Millennium Technologies, they

12    haven't switched that.

13              THE COURT:  But the house was sold, they were in

14    the process of --

15              MR. EAMAN:  It wasn't sold.  It was being sold.

16              THE COURT:  It was being sold.

17              MR. EAMAN:  Being sold, that's true.  There was a

18    computer there and there were documents there, but there was

19    no investigation to determine that, in fact, they had moved

20    the MTI business things, the computers, to Newcastle.  As the

21    affiant noted in the affidavit they had previously had an

22    office, an MTI office, at another location.  There was no

23    attempt to investigate where MTI was now because their

24    registered address was still Newcastle.  So what the agents

25    did is what the same thing the agents did in McPherson --

```
 1              THE COURT:  MTI wasn't at Newcastle?

 2              MR. EAMAN:  It wasn't at Newcastle.

 3              THE COURT:  You said was still Newcastle.

 4              MR. EAMAN:  I'm sorry.  Still at Davis Court.  I

 5    misspoke myself.  I apologize.

 6              THE COURT:  Okay.

 7              MR. EAMAN:  It was still at Davis Court.  So there

 8    was no -- it was like McPherson in the sense that they said

 9    these people were doing something at Davis Court and now they

10    have moved to Newcastle so they must be doing something at

11    Newcastle so we need to go there to find what is at

12    Newcastle, without any particular fact as to what was going

13    on at Newcastle or whether any of the items they sought to

14    seize were, in fact, at Newcastle.  Nobody observed anything

15    there.  Nobody did any investigation as to whether anything

16    was there.  Nothing happened other than this family moved

17    this residence, kept Davis Court as the registered address

18    for the business, and that was it.  So we don't think that's

19    sufficient particular probable cause to go to that address to

20    search.

21              That concludes my arguments, Your Honor.

22              THE COURT:  What is it that you think would benefit

23    you in terms of an evidentiary hearing, what are you seeking

24    at the evidentiary hearing?

25              MR. EAMAN:  What we are seeking is to show that
```

1    there is evidence -- that we can show that there is evidence

2    that the allegations -- the Franks claims that we make, that

3    the allegations of the affiant were in reckless disregard of

4    the truth because factually many of the allegations are false

5    and there are many omissions in the allegations as well.

6    That's what we are asking for the evidentiary hearing as to

7    that prong of our suppression argument.

8             THE COURT:  All right.  Thank you.

9             MR. EAMAN:  Thank you.

10            THE COURT:  Ms. Corken.

11            MS. CORKEN:  Your Honor, under Franks vs. Delaware

12    in order to obtain an evidentiary hearing the Defendants must

13    make a substantial preliminary showing with respect to three

14    matters:  One, that a false statement was made in the

15    affidavit; two, that the affiant made that false statement

16    intentionally or with reckless disregard of the truth; and

17    thirdly, that there is no probable cause in the affidavit

18    without the statement.

19            Focusing on the second requirement that it is the

20    affiant who made the false statement, the Defendants' motion

21    fails on that count.  The Sixth Circuit Court of Appeals made

22    clear in United States vs. Giacalone that the allegedly false

23    statement must have been shown to originate, to originate,

24    with the Government affiant, not a third party.

25            Now, Special Agent Jeffery Edwards, the affiant,

```
 1   had no knowledge obviously of the GM documents, had no
 2   personal knowledge himself of the work duties of Shanshan Du.
 3   It is clear from the affidavit certainly that everything
 4   relating to GM came from GM, from Peter Savagian, in
 5   particular.
 6          Now, the defense makes a somewhat artificial
 7   argument that every sentence in the affidavit had to begin
 8   with according to GM Engineering Director Peter Savagian, but
 9   that is an argument that really places form over substance.
10   When you read the affidavit it is quite clear that the
11   information originated with Peter Savagian in particular.
12   And, again, Jeff Edwards, you know, doesn't work for GM.  He
13   would himself have no knowledge about the nature of the GM
14   documents and whether they constitute trade secrets.
15          I would like to focus in particular on paragraph 37
16   because there's been a lot of argument about this paragraph
17   by the Defendants, and this is one of their claims in terms
18   of false statements.  Paragraph 37 provides that the majority
19   of the documents pertaining to, and this is critical, GM's
20   hybrid electric motor controller card that GM deems
21   confidential and proprietary were marked as such.
22          Now, the defense claims that this is a false
23   statement, and they point to a -- the broad universe of every
24   document that was on the hard drive used in the Defendants'
25   business and state that, well, the majority of the
```

1    documents -- all of the documents on this hard drive were not

2    marked confidential and therefore this statement must be

3    false.

4          Well, just to step back for a moment, CPC

5    representatives recovered this hard drive that was used in

6    the Defendants' business, Millennium Technologies,

7    Incorporated, MTI, and they did find that there were numerous

8    GM documents on that hard drive which we refer to as the MTI

9    hard drive in our response, and they contacted GM.  GM made

10   an image, a copy of that hard drive, and Peter Savagian, and

11   this is according to the affidavit, Peter Savagian reviewed

12   not the entirety of the MTI hard drive as it is clear in the

13   affidavit, he reviewed one directory in that hard drive, and

14   he identified trade secret documents of GM in that directory,

15   and he categorized those documents as falling into five

16   different categories of information, and those five

17   categories are laid out in the affidavit.  There are some

18   documents, for instance, that related to GM power train

19   sister information, that's one category that is set forth in

20   the affidavit.

21         Paragraph 37 in the affidavit is in the section of

22   the affidavit entitled GM hybrid motor controller card

23   information.  Peter Savagian identified specific documents

24   from this directory that related to the GM hybrid motor

25   controller card.  The motor controller card is just a circuit

1   board.

2           In paragraph 35 the affidavit relates that

3   Peter Savagian identified particular information that was in

4   this directory that related to the circuit card to this motor

5   controller card.  The affidavit states that he identified the

6   software source code for the card's microprocessors, the

7   programable logic devise configuration, the schematic and

8   assembly drawings for the card itself and the fabrication

9   drawings and detailed parts list.  That's the universe of

10  documents that he identified that related to the GM hybrid

11  motor controller card that were in this directory on the MTI

12  hard drive.

13          Paragraph 36 goes on to describe whether Du's work

14  duties required her to have these very specific documents.

15  So the paragraph states that she would have had a legitimate

16  reason to possess the software source code, but with respect

17  to some of these other very specific documents she did not

18  have a legitimate work reason to possess them.

19          Then paragraph 37, the critical paragraph, says the

20  majority of the documents pertaining to the hybrid electric

21  motor controller card that GM deems confidential and

22  proprietary were marked as such.

23          THE COURT:  Let me ask you a question, just

24  stopping your argument there in 36, would the job

25  descriptions have laid out what -- these things that are in

Motion Hearing - January 20, 2011

1    this paragraph or would it just be more general?

2           MS. CORKEN:  It was more general.  It was

3    absolutely more general.  The job performance evaluations,

4    for instance, did not say one way or the other whether her

5    work duties included assignments related to the programable

6    logical devise.

7           THE COURT:  All right.

8           MS. CORKEN:  So just to go on, Your Honor, then in

9    paragraph 38 it begins many of the aforementioned GM

10   documents, and then paragraph 39 begins other documents, so

11   it is clear from reading this section of the affidavit that

12   the -- that this section, including paragraph 37, addresses

13   very specific documents, those that are identified in

14   paragraph 35, those that Peter Savagian identified that

15   related to the motor controller card.

16          The defense has been provided with the 302 of

17   Peter Savagian, and in that 302, just as in the affidavit, it

18   is related that he identified particular documents relating

19   to this controller card and there are a total of seven

20   documents that he identified relating to this card.  He

21   provided -- because at this point it was GM and GM alone who

22   had the hard drive, the FBI didn't even have it.

23   Peter Savagian provided copies of those seven documents to

24   Jeff Edwards.  Jeff Edwards put those into evidence.  A

25   review of those seven documents indicates that five out of

1   seven of the documents were marked either confidential or

2   proprietary, exactly what paragraph 37 says, that the

3   majority of these documents, these documents that

4   Peter Savagian identified that related to this hybrid

5   controller card, were, in fact, marked confidential or

6   proprietary.  So there is no falsity in the statement that is

7   set forth in paragraph 37.

8          The Defendants have also claimed -- before I move

9   on, the Court could take out this entire section,

10  paragraph 37 and everything that is set forth in this section

11  of the affidavit relating to the hybrid controller card, and

12  still find that Judge Scheer appropriately found probable

13  cause.  The affidavit sets forth four other categories of

14  trade secret documents that Peter Savagian identified on the

15  MTI hard drive, so removing this section does nothing to

16  defeat probable cause in the affidavit which is, of course,

17  one of the requirements set forth in Franks vs. Delaware that

18  the defense must show that there is -- that probable cause is

19  lacking if the allegedly false statement is redacted.

20         The defense also points to a paragraph relating to

21  Shanshan Du's job performance and states that that is a false

22  statement, and that it was --

23         THE COURT:  It is what?

24         MS. CORKEN:  That that's a false statement and that

25  Agent Edwards should have known it was a false statement.

1          THE COURT:  Which number is that paragraph?

2          MS. CORKEN:  It is in the front of the affidavit, I

3    know.  It is paragraph 18 of the affidavit on page 5, after

4    several years Du's supervisors at GM considered Du's work

5    performance mediocre.  There were some friction between Du

6    and her supervisors and peers, and then it goes on to say

7    that Peter Savagian offered her this buyout and, you know,

8    the implication obviously is that she was offered this buyout

9    because her work performance wasn't up to snuff.

10          Now, the defense says, well, this has to be a false

11    statement because her 2004 performance evaluation indicates

12    that her performance was okay.  Well, paragraph 18 does not

13    state Du's performance evaluation in 2004 indicates that her

14    performance was mediocre, it doesn't state that at all.  It

15    says that her supervisors considered her work performance

16    mediocre, and the 2005 performance evaluation does

17    substantiate that, but more importantly, Jeff Edwards was

18    speaking with Peter Savagian clearly and Peter Savagian was

19    in the supervisory chain of Shanshan Du, and he was familiar

20    with her work certainly, and there was nothing to indicate to

21    Jeff Edwards that Mr. Savagian's opinion of her work

22    performance was in any way to be doubted.  And, in fact, it

23    was basically corroborated by the fact that she was one of

24    the employees that was chosen to, you know, be offered this

25    buyout package, and it made sense that her performance was

1    not satisfactory and that she was chosen to receive that

2    buyout package.

3            The defense also makes -- both in its reply and

4    today makes much of whether documents are marked confidential

5    or not.  The bottom line is that there is no false statement

6    in the affidavit relating to those markings.  I would

7    certainly dispute the defense characterization of the GM

8    training materials.  Those training materials, which are

9    attached as Attachment C to the defense's reply, do not

10   indicate that only documents marked secret are considered

11   trade secret.  In fact, it states that those documents that

12   are marked secret are often considered strategic or trade

13   secrets.  It certainly doesn't exclude the possibility that

14   GM documents marked confidential or proprietary or not marked

15   at all are still considered GM trade secrets.

16           More importantly, it is not GM's definition of

17   trade secret that controls, it is the statute's definition of

18   trade secret that controls.  There is nothing in the statute

19   that indicates that a document must be marked by a company in

20   some way to be considered a trade secret.  The statute

21   specifically provides that the measures taken by a company to

22   protect its trade secret information must be reasonable, and

23   that's the only thing that the statute requires.

24           Now, certainly Magistrate Judge Scheer could find

25   that the measures that GM employed to protect its

1    information, whether they were marked or not, were reasonable

2    measures, and those measures are laid out in some detail in a

3    separate section of the affidavit.  They encompass physical

4    measures and electronic measures.  A document, regardless

5    whether it is marked or not, could certainly be protected by

6    restrictions on access, for instance.  So the litmus test is

7    not in the statute whether a document is marked confidential

8    or not, and most importantly the information that is in the

9    affidavit relating to the markings of documents is absolutely

10   accurate.

11          The last point in terms of false statements that

12   the defense raises today in its papers relates to this

13   confrontation that Du had with GM representatives, and the

14   claim is that during that confrontation she apologized for

15   having taken GM documents home and that she had deleted them.

16   Well, in fact, there were no deletion -- there weren't

17   deletions of GM materials.  We now know after computer

18   forensics that the GM trade secret documents exist on

19   multiple computers and electronic devices and were not

20   deleted at the time that they were seized in May of 2006,

21   well over a year after Shannon Du left GM's employment.  The

22   forensics, just for the record, also indicate that, in fact,

23   those documents were accessed after she left GM employment as

24   well.

25          Your Honor, moving on to -- just to conclude that

1    section of my argument, the defense has not established by a

2    substantial preliminary showing that there are any statements

3    in the affidavit that are false.  They haven't established

4    that Jeff Edwards intentionally lied or acted with reckless

5    disregard to the truth, and they certainly have not shown

6    that redaction of the allegedly false statements basically

7    destroys the probable cause in the affidavit, so an

8    evidentiary hearing is not warranted under these

9    circumstances.

10          THE COURT:  Do you think that an evidentiary

11   hearing would be warranted to give Defendants the opportunity

12   to contradict what you just -- for instance, one item, you

13   just indicated that forensics show these were not deleted as

14   she said and they were, in fact, referenced by her.

15          MS. CORKEN:  Well, I don't think that an

16   evidentiary hearing would be of any benefit on that point

17   because that was information that was developed -- that was

18   information that was developed after the search warrant was

19   executed.  Now, the GM documents, trade secret documents, did

20   exist on the MTI drive when the affidavit was created in May

21   of 2006, and Shannon Du supposedly claims she had deleted

22   documents.  Well, they were still there at the time that CPC

23   seized that computer in August of 2005.  She left GM's

24   employment in March of 2005 so months later the GM trade

25   secret documents still existed on the MTI hard drive.  And I

Motion Hearing - January 20, 2011

 1    don't think that point is disputed in any way, so I don't

 2    think that an evidentiary hearing would be beneficial on that

 3    point.

 4          Your Honor, Magistrate Judge Scheer certainly had

 5    sufficient facts before him to conclude that Defendants

 6    intended to convert the GM trade secret information to their

 7    own benefit.  First of all, there is no requirement that the

 8    Government must show that the Defendants actually used the

 9    trade secret information in order to establish that intent.

10    And there are --

11          THE COURT:  What needs to be shown?

12          MS. CORKEN:  Well, it can be shown from other

13    evidence, Your Honor, but first and foremost there is

14    evidence of use in this case, and that's set forth in

15    paragraphs 44 and 45 of the affidavit.

16          There are two documents -- those paragraphs

17    describe two documents that were found on the MTI drive that

18    incorporated GM information.  Those documents are not GM

19    documents and yet they incorporated GM information, and one

20    of those documents, in fact, specifically referred to these

21    GM devices.  GM IGBTs were referenced in this document.  So

22    contrary to the defense claim though it is not required the

23    affidavit does set forth actual use of the GM information in

24    documents that were found on a hard drive that was used in

25    the Defendants' business.

1        But in addition to that Judge Magistrate Sheer had

2   before him the following facts:  Shannon Du copied thousands

3   of GM files to a hard drive used in her and her husband's

4   business days after she was offered a severance agreement and

5   with one foot out of GM's door.  Now, certainly she is not

6   copying those thousands of files for work purposes.  A

7   reasonable conclusion is that she and her husband intended to

8   convert them for somebody's use other than GM's.  She then

9   falsely affirmed to GM just six weeks later on the last day

10  of her employment that she had returned all GM documents

11  when, in fact, she had not.

12       Now, there are extensive facts in the affidavit

13  relating the value of the GM trade secret documents to the

14  business of MTI.  MTI had a business that involved the power

15  control field, and Peter Savagian was -- became familiar with

16  what MTI did in this field, and he states -- you know, it is

17  stated in this affidavit that particular GM documents found

18  on the MTI drive would have been a value to MTI's business in

19  the power electronics field.

20       In addition, MTI had embarked on two ventures

21  relating to hybrid vehicle technology, one in 2004 and one in

22  2005.  Both of those ventures involved selling hybrid vehicle

23  motor control technology to China, and the MTI -- excuse me,

24  the GM documents on the MTI drive largely related to the

25  motor control of a hybrid vehicle.  There are several

1    paragraphs in the affidavit where it is relayed that

2    Peter Savagian looked at these two ventures that MTI was

3    undertaking in 2004 and 2005, and then he basically looked at

4    the documents that were on the MTI hard drive and concluded

5    that those documents would have been a value to MTI,

6    particularly if MTI was embarking on a venture that involved

7    selling that technology.

8         So given the value of the GM documents to MTI's

9    business ventures both in the power electronic field and in

10   the hybrid vehicle area, Judge Magistrate Sheer could

11   certainly conclude in addition to Shannon Du's conduct in

12   copying these documents very shortly before her departure

13   that the Defendants intended to convert the documents for

14   their own use or the use of their company.

15        Now, certainly Magistrate Judge Sheer's decision in

16   that regard was not arbitrary, and, of course, at this point

17   the Court is required to give his decision great deference.

18   So given all of those facts it is the Government's position

19   that he was certainly entitled to find that there was

20   probable cause to believe the Defendants intended to convert

21   the documents to their own economic use.

22        Lastly, Your Honor, with respect to the probable

23   cause to search the Newcastle residence, the defense has

24   cited this McPherson case and I believe the facts are a

25   little bit different than what was relayed by Mr. Eaman.  In

1    my reading of the case at least it appears that in that case

2    the defendant was arrested for an assault charge.  Officers

3    had gone to his home to execute a warrant in which he was

4    charged with an assault charge, and they arrested him outside

5    of his home, and then they searched him incident to his

6    arrest and they found some cocaine in his pocket, and then

7    they obtained a search warrant basically alleging just that

8    fact, that one fact, that he was outside of his home and

9    there was cocaine in his pocket.  There was no other -- there

10   was no indication that he was a drug dealer.  There was no

11   information from a confidential informant.  There was simply

12   the fact that he had cocaine in his possession outside of his

13   home.  And the Sixth Circuit Court of Appeals understandably

14   found that that was not a sufficient nexus between whatever

15   the Defendant's -- whatever his drug activities were and his

16   home.

17          The case that we have here is far different and

18   certainly the facts before Magistrate Judge Scheer were

19   beyond those that were set forth in McPherson.  For instance,

20   in the affidavit it is relayed that Defendant Du told GM

21   representatives that she used a flash drive to transfer the

22   GM documents to the MTI hard drive and that the flash drive

23   was located in her residence.  I mean, that fact alone would

24   allow the FBI -- would allow a magistrate to find probable

25   cause to search the Newcastle home.

1          THE COURT:  And they hadn't actually moved into

2     Newcastle yet, or had they?

3          MS. CORKEN:  They had.

4          THE COURT:  They actually had even though they

5     still had the Davis house?

6          MS. CORKEN:  Yes.  The affidavit, I believe,

7     describes it that agents went in as prospective buyers,

8     posing as prospective buyers, and a real estate agent -- the

9     house is for sale, the real estate agent was selling the

10    home.  There was very little in the house at that time.

11    There was one computer, there was some MTI files, but there

12    was not much else there.  They had moved, and I believe the

13    affidavit lays out too that the utilities had been switched

14    to the Newcastle residence.  I don't think there is any

15    dispute about the fact that the Defendants had moved into the

16    Newcastle home at this time.

17         The affidavit also explained that -- back to the

18    flash card for a second.  The affidavit explained that

19    Shannon Du could not have taken that flash card and directly

20    plugged it into the hard drive, she had to use an

21    intermediary computer.  So the facts establish that there

22    were three computers and there was only one in the Davis

23    Court residence, so certainly it was reasonable to conclude

24    that these additional two computers were in the Defendants'

25    new residence.

1          Now, the defense makes this necessity argument

2     that, well, CPC had already imaged in the context of the

3     civil case the three computers, so the FBI could have

4     subpoenaed CPC and gotten those images itself.  I assume the

5     defense is concluding therefore there is no probable cause.

6     Well, necessity is not a factor that Judge Scheer was

7     supposed to take into account, and certainly he was not

8     obligated to require the FBI to seek a subpoena to get

9     second-best evidence, copies of the images of the hard

10    drives, as opposed to obtaining a search warrant for the

11    original evidence, the original computers.

12          There is also set forth in the affidavit a number

13    of --

14          THE COURT:  This is one of those areas where had

15    you used the copies defense would be back saying you had the

16    copies and not the original?

17          MS. CORKEN:  Surely.

18          THE COURT:  Okay.  Go on.  This house thing doesn't

19    bother me.  Go on.

20          MS. CORKEN:  There are also a number of sources of

21    information cited in the affidavit that the Defendants used

22    their residence as a principal place of business.  There was

23    no evidence that MTI operated anywhere other than their

24    residence.  So the fact that they had moved their residence

25    to the Newcastle address, you know, Judge Magistrate Scheer

Motion Hearing - January 20, 2011

1    certainly was reasonably concluded that they were then using

2    their new residence as the principal place of business for

3    their MTI company.

4         And in addition, the agents' tour of their home

5    corroborated that because there were some, but very few, MTI

6    files that were actually in their old residence.  Again, one

7    could reasonably conclude that there were additional

8    documents that were located in the new residence.

9         So, I mean, given all of the facts that are laid

10   out in the affidavit there was certainly fair probability,

11   which is the standard, a fair probability that evidence of

12   crime would be found at the Newcastle residence.

13        And then lastly, Your Honor, even if the Court were

14   to find that Magistrate Judge Scheer was wrong and that, you

15   know, despite the great deference that is given to his

16   decision at this stage that there really wasn't probable

17   cause to search the Newcastle residence or that there wasn't

18   probable cause on the intent to convert, certainly the

19   exclusionary rule should not apply because the agent relied

20   in good faith on the warrant.  This is a 36-page affidavit.

21   It is full of detail.  It is -- in my experience, it is one

22   of the best affidavits I have ever seen.  The agent having

23   brought the affidavit to an AUSA which is indicated by the

24   fact that Sheldon Light's name is on the top of the search

25   warrant, he got it reviewed by an AUSA, and then a magistrate

1    found probable cause and given the nature of the affidavit

2    itself certainly his reliance on that warrant was in good

3    faith and he had a belief in its validity that was

4    reasonable.  So even if probable cause is found lacking the

5    good-faith exception to the exclusionary rule should apply.

6         THE COURT:  All right.  Reply?  Mr. Eaman, starting

7    backwards, the fact that the Newcastle home, I think that's a

8    fairly weak argument, but I would like you to -- sorry about

9    that, but I think that's your weakest argument.

10        MR. EAMAN:  I thought it was our strongest.  That

11   shows what I know.

12        THE COURT:  I mean, looking at that do you have any

13   evidence that MTI was operated anywhere other than the

14   residence of these parties?

15        MR. EAMAN:  Well, it had, and it is in the

16   affidavit that it had been operating at other places --

17        THE COURT:  You said that --

18        MR. EAMAN:  -- in the past.

19        THE COURT:  -- but I don't know what evidence, it

20   just says it.

21        MR. EAMAN:  I quarrel with the Court only because I

22   don't think we have to come forward showing evidence that MTI

23   worked -- had business at another location at the time the

24   affiant executed the affidavit.  I think the job is on the

25   affiant to investigate, to determine whether or not, in fact,

1    the items that he seeks to seize are on the premises of the

2    place that he seeks to seize.

3            THE COURT:  Okay.  What about her statement, Du's

4    statement, that she gave -- that she copied it to a hard

5    drive -- excuse me, to a flash drive and that the flash drive

6    was at her residence?

7            MR. EAMAN:  Well, let me back up.

8            THE COURT:  Are you --

9            MR. EAMAN:  I don't know whether the flash drive

10   was at her residence or whether a flash drive was recovered.

11   If a flash drive was recovered it had deleted documents on

12   it, I believe.  And let me say as to the computers they say

13   they are looking for three computers and only one is at

14   Davis Court, but they identify in paragraph 138 that CPC had

15   the originals of those three computers.  If you read

16   paragraph 138 CPC took the hard drives out of those computers

17   and cloned them and gave the clones back, I believe, is the

18   procedure that was followed, so CPC had the originals.  They

19   weren't going after the originals.  They had access without

20   going there, so there really was nothing to find there.  I

21   don't -- whether the flash drive had it or not, they had the

22   documents on several computers.

23           A flash drive, obviously, is used to transfer.

24   They had an admission of Ms. Du that she had used the flash

25   drive to transfer.  They had the CPC desktop, the CPC laptop,

1    the hard drive that was left at CPC, they had the three

2    drives from the computers that were at their home already in

3    CPC's possession, so what was there to get from the

4    residence?  Certainly a flash drive that was used in the

5    transfer process where they have basically all the computers

6    the family had access to would not be sufficient to establish

7    probable cause to conduct a general search of the premises,

8    seize all the computers and all the documents at the place.

9                Let me correct one thing that the Government said.

10               THE COURT:  Did the Government have what C -- what

11   is it?

12               MR. EAMAN:  CPC.

13               THE COURT:  CPC.  Did the Government have what CPC

14   had at the time of the search warrant?

15               MR. EAMAN:  Absolutely.  As we note in our reply,

16   the Government had access to CPC and they got the information

17   from CPC, they got the hard drives from CPC, they had

18   everything from CPC.  They asked that a representative of CPC

19   come with them on the search to look through the house.

20               THE COURT:  Okay.  Just a minute.  How long before

21   the search did they have the CPC --

22               MR. EAMAN:  Long enough to do the analysis to find

23   the documents on the drives that they were talking about in

24   the affidavit.

25               THE COURT:  But what does that mean?  What does

1    that mean, long enough?  Are we talking months?
2            MR. EAMAN:  Yes, months.
3            THE COURT:  Okay.
4            MR. EAMAN:  I think from May to August if memory
5    serves me correct.
6            THE COURT:  So they would have no way of knowing
7    what would be on the Millennium drives, the MTI drives, as of
8    the date of the search warrant?
9            MR. EAMAN:  Yes, they would.
10           THE COURT:  How?
11           MR. EAMAN:  They had those drives.  CPC took the
12   Millennium hard drive and had possession of it and they had
13   possession when they contacted the Government.  We don't
14   know, and this is where an evidentiary --
15           THE COURT:  But you're assuming that then
16   Millennium stopped doing anything.  You don't know that there
17   wouldn't be evidence on the drives in the home of MTI using
18   this information?
19           MR. EAMAN:  Well, we do know that the three
20   computers that were at the home of Qin and Du were copied and
21   given to CPC.
22           THE COURT:  Yes, but that's why I asked you how
23   long ago.  There is a period of time that went by.
24           MR. EAMAN:  Again, our problem with the affidavit,
25   to be frank, no pun intended, that would be a double pun in

1    this case, I guess, is that when we get the discovery and we

2    do the analysis it appears to us this affidavit is on its

3    face terrific because it is lengthy and it is detailed but on

4    its face it is misleading.  It omits things and reaches

5    conclusions that are not correct.

6         THE COURT:  Go specifically to what it is that you

7    believe an evidentiary hearing would disclose.

8         MR. EAMAN:  Well, there are all kinds of

9    allegations going back about this paragraph 37, the majority

10   of the documents are marked confidential, the hybrid electric

11   motor controller card documents.  Again, I'm not sure.

12   Paragraph 37 doesn't identify what a hybrid electric motor

13   controller card is or which documents refer to that so we are

14   not sure where there are competing allegations here about

15   that paragraph 37.  I think an evidentiary hearing would be

16   helpful to see what the affiant had.  If we are right that

17   only 5 out of 14 documents that Savagian looked at were

18   marked confidential, then to say that these documents --

19   these particular documents were marked -- the majority were

20   marked confidential omits the conclusion that the majority of

21   all of the documents were not marked confidential.

22        There were 3,000 GM documents in the Shanshan

23   directory, I believe that's the right number.  There were --

24   again, they were block transferred as if they were being

25   backed up from time to time.  I disagree.  Again, an

 1    evidentiary hearing would show that there was any access to

 2    these documents after it was disclosed that they were on the

 3    MTI hard drive and Ms. Du met with General Motors and told

 4    them that she had deleted the documents.

 5         The evidentiary hearing would also establish that

 6    the Micron Millennium computer that the GM materials found in

 7    there, which that hard drive would have been in the

 8    possession of CPC, we believe, but the Government

 9    subsequently got it in the search warrant, that the GM

10    documents and the Micron Millennium computer were in the

11    deleted items file.  So the Government had access to a

12    computer of Qin and Du that showed that Du or someone had

13    gone in and deleted the GM documents just like she told

14    General Motors she had.  So those are some of the things.

15         Also, regarding the offer to buyout, again, it is

16    misleading.  There were thousands of General Motors employees

17    offered buyouts at this time.  As I'm sure the Court is

18    aware, General Motors was beginning its downward slide for

19    reasons that has nothing to do with this case and were buying

20    out employees right and left on every level.  So the fact

21    that she was offered a buyout would not -- does not -- it is

22    not evidence that she was -- let me back up -- is not

23    evidence that she was a bad employee.  But, again, offered a

24    buyout and the fact that she copied it on a day or a day

25    after she was offered the buyout, she hadn't accepted the

1    buyout, she hadn't decided to accept the buyout, so the

2    affidavit noticed she was upset, she didn't want to leave GM,

3    that's what she told them, that she was upset she was being

4    offered a buyout.

5         THE COURT:  Is there any indication that this is

6    the first time that she copied this information?

7         MR. EAMAN:  I'm not sure about that.  I think an

8    evidentiary hearing would clear that up.  I think she had

9    backed up -- because they were copied to the hard drive after

10   that point, but they were -- the other thing that is omitted

11   here is everything -- every document that she supposedly

12   shouldn't have had access to was on her GM laptop which

13   although GM took reasonable measures to secure it that laptop

14   was found basically in a closet unsecured after this

15   investigation began and then secured.  So there is an awful

16   lot of misleading facts in this affidavit.

17        The reference to paragraph 44 that they found that

18   one of the GM documents had been accessed and that

19   calculations had been made, but I refer to that in my

20   original argument they were made in 2004 when Du was still

21   working at GM and they are part of e-mails that go back and

22   forth between Qin and Du where Qin was assisting Du with the

23   calculations that she was making while she worked at

24   General Motors.  They weren't being accessed to do

25   calculations to provide to any third party.

1          THE COURT:  Say that again.  She had access on

2    calculations she was making while she worked at General

3    Motors?

4          MR. EAMAN:  While she was working at General Motors

5    Qin helped her with some calculations and accessed some of

6    the GM documents to help her with those and e-mailed her the

7    calculations that he did to assist her in her work at

8    General Motors.  It was not a case where the GM document was

9    accessed, calculations were done and they were shipped off to

10   a third party or they were retained for further use.  They

11   were not accessed after Qin e-mailed them to Du to assist her

12   at General Motors because -- I may have said this originally,

13   but these are two electrical engineers, both of them with

14   experience in hybrid technology.

15          The Cherry Motors venture that they talk about

16   consists of e-mails back and forth and a business plan

17   drafted originally in Chinese by a Dr. Gjau (phonetic) for a

18   hybrid car, and it is sort of like do you want to build a

19   hybrid car, do you want to try to sell hybrid technology to

20   Cherry Motors, what do you think we should do here?  There

21   was a manufacturer's rep involved and a few e-mails went back

22   and forth.  That was it.  There is no contact with Cherry

23   Motors.  There is no phone call to Cherry Motors.  There is

24   no e-mail to Cherry Motors.  There is no letter to Cherry

25   Motors.  There was no contact whatsoever with China about

```
 1    anything.

 2            And, again, Savagian, and I suppose the affiant may

 3    have had to accept this, says, well, this technology might

 4    have been useful for the venture that was discussed with

 5    Cherry Motors.  There was no venture that ever happened,

 6    number one.  Number two, it was what is called a direct-drive

 7    hybrid car, a different kind of car than General Motors made.

 8            In terms of utilities, the utilities at both houses

 9    were still in the names of Du and Qin.  We don't dispute the

10    affiant saying that the utility usage in Davis Court fell off

11    and the utility usage at Newcastle went up, and from that I

12    think they can conclude that it was their principal residence

13    at the time.  The issue is are there facts alleged here other

14    than it is their principal residence that would lead to

15    probable cause that what they were looking for was, in fact,

16    at Davis Court and not in some other location.

17            Does the Court have any questions?

18            THE COURT:  No.

19            MR. EAMAN:  Thank you, Your Honor.

20            THE COURT:  All right.  I really do not see the

21    need here for an evidentiary hearing.  It seems to me that

22    these facts are here from which the magistrate judge could

23    appropriately make his ruling.  I want to review this.  I

24    will review the attachments to the affidavit again in light

25    of the arguments.  I think I will have you come back in so I
```

1   can give you my ruling because for me to write it would take

2   much longer time than simply to tell you.  So let me ask

3   you -- I need probably, given the schedule, about two weeks.

4   Let's look at the beginning of February.  I don't know if

5   there is any time more convenient, but I'm just picking a

6   date here, February 3rd.  I do have time in the morning on

7   that date.  How is that schedule?

8           MR. EAMAN:  Judge, I just found out last night I

9   may have to go out of town that weekend, so I was planning on

10  leaving that day.

11          THE COURT:  That day?

12          MR. EAMAN:  That day, Thursday, February 3rd.

13          THE COURT:  Let me go back a day.

14          MR. EAMAN:  February 2nd would be okay if the Court

15  can move it up a day, or the following --

16          THE COURT:  Mr. Morgan.

17          MR. MORGAN:  Judge, before you go looking again, I

18  would indicate to the Court that I am leaving on a prepaid

19  trip Friday, January 28th and returning on February 9th.

20  Although, if it is the Court's ruling I'm sure the Court

21  would not have a difficulty if Mr. Eaman was here for both

22  Defendants.  I don't think my client, although it is

23  premature for me to say that, that my client would have a

24  problem with that.

25          THE COURT:  I could do it February 9th.  Are you

1    going to be back in town, Mr. Eaman?

2            MR. EAMAN:  On February 9th I will be.  Looks like

3    I have a preliminary examination in 36th District Court that

4    morning, but I could be here in the afternoon on the 9th if

5    that works for the Court.

6            THE COURT:  February 9th I could do it at 2:00.

7            MR. EAMAN:  That's fine, Your Honor.

8            THE COURT:  Okay.

9            MR. EAMAN:  Thank you.

10           THE COURT:  All right.  All right.  Then I will see

11   you back here February 9th at 2:00.

12           MR. EAMAN:  Thank you.

13           MS. CORKEN:  Thank you, Your Honor.

14           THE COURT:  Thank you very much.

15           (Proceedings concluded at 11:39 a.m.)

16                       –      –      –

17

18

19

20

21

22

23

24

25

```
 1                              CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4   the United States District Court, Eastern District of

 5   Michigan, do hereby certify that the foregoing pages comprise

 6   a full, true and correct transcript taken in the matter of

 7   THE UNITED STATES OF AMERICA vs. YU QIN and SHANSHAN DU, Case

 8   No. 10-20454, on Thursday, January 20, 2011.

 9

10                            s/Robert L. Smith
                             Robert L. Smith, CSR 5098
11                           Federal Official Court Reporter
                             United States District Court
12                           Eastern District of Michigan

13

14

15   Date:  04/13/2011

16   Detroit, Michigan

17

18

19

20

21

22

23

24

25
```