```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                            —   —   —

      UNITED STATES OF AMERICA,
 4
                   Plaintiff,
 5                                          Case No. 10-20454
          vs.
 6                                          Hon. Marianne O. Battani
      YU QIN and SHANSHAN DU,
 7
                   Defendants.
 8    _____/

 9                         SENTENCING HEARING

10            BEFORE THE HONORABLE MARIANNE O. BATTANI
                     United States District Judge
11           Theodore Levin United States Courthouse
                     231 West Lafayette Boulevard
12                       Detroit, Michigan
                      Wednesday, May 1, 2013
13

14    APPEARANCES:

15    For the Plaintiff:    CATHLEEN M. CORKEN
                            MICHAEL MARTIN
16                          LINDA M. AOUATE
                            U.S. Department of Justice
17                          211 W. Fort St., Ste. 2001
                            Detroit, MI 48226
18                          (313) 226-9100

19    For the              FRANK D. EAMAN
      Defendants:          645 Griswold St., Ste. 3060
20                         Detroit, MI 48226
                           (313) 962-7210
21                            on behalf of Yu Qin

22                         ROBERT M. MORGAN
                           615 Griswold St., Ste. 1125
23                         Detroit, MI 48226
                           (313) 961-7070
24                            on behalf of Shanshan Du
```

*To obtain a copy of this official transcript, contact:*
25          *Robert L. Smith, Official Court Reporter*
          *(313) 964-3303 • rob_smith@mied.uscourts.gov*

# TABLE OF CONTENTS

Page

MOTION RE: BRADY MATERIAL
by Mr. Eaman........................................  8
Response by Mr. Martin............................. 11
Reply by Mr. Eaman................................. 13
Ruling by the Court............................... 14

MOTION RE: PROTECTIVE ORDER
by Mr. Eaman....................................... 14
Response by Ms. Corken............................ 16
Reply by Mr. Eaman................................ 19
Ruling by the Court.............................. 20

SENTENCE OF DEFENDANT QIN
Allocution by Mr. Eaman....................... 24, 39
Allocution by Defendant Qin....................... 32
Allocution by Ms. Corken.......................... 32
Sentence by the Court............................ 42

SENTENCE OF DEFENDANT DU
Allocution by Mr. Morgan...................... 54, 69
Allocution by Defendant Du........................ 59
Allocution by Ms. Corken.......................... 60
Sentence by the Court............................ 70

 1    Detroit, Michigan

 2    Wednesday, May 1, 2013

 3    at about 2:06 p.m.

 4                              —   —   —

 5              (Court, Counsel and Defendants present.)

 6              THE CASE MANAGER:  All rise.

 7              The United States District Court for the Eastern

 8    District of Michigan is now in session, the Honorable

 9    Marianne O. Battani presiding.

10              You may be seated.

11              THE COURT:  Good afternoon.  We are resuming our

12    sentencing.  You may be seated.  All right.  We will do

13    Mr. Qin first.

14              MR. EAMAN:  Fine, Your Honor.

15              THE COURT:  Let me state for the record, the Court

16    has received for Mr. Qin and Ms. Qin -- Ms. Du, excuse me,

17    various letters.  Mr. Qin's were attached to a document

18    entitled confidential sentencing memorandum, and the Court

19    has reviewed that.  The Court has reviewed the sentencing

20    memorandum and, of course, we have gone through much of what

21    was in that.  The Government has also submitted a sentencing

22    memorandum which was also referenced yesterday, but the Court

23    has reviewed that.

24              I would indicate that -- if Mr. Qin and Mr. Eaman

25    would come up to the podium, please.

1          MS. CORKEN:  Your Honor, before we begin may I

2    bring up one matter?

3          THE COURT:  Certainly.

4          MS. CORKEN:  It relates to the materials that were

5    submitted under seal by the defendants.  Your Honor --

6          THE COURT:  You are talking about the licensing

7    agreements yesterday --

8          MS. CORKEN:  Actually that was --

9          THE COURT:  -- or the sentencing memorandum?

10         MS. CORKEN:  There are two issues, actually, one

11   relate to the confidential materials that were submitted by

12   the defendants and so I will address that first.  Your Honor,

13   the defendants are asking -- both of the defendants are

14   asking for probation in this case and they rely in large part

15   on materials that were submitted to the Court under seal.

16   And the Government doesn't anticipate anything other than

17   discussing the conclusions of what was submitted to the Court

18   and some of the content of what was submitted.  We need to

19   address what the defense is raising, their claim, and in

20   order to do so we need to address obviously the materials

21   that were submitted to the Court.

22         THE COURT:  I understand that.

23         MS. CORKEN:  The second issue, Your Honor, does

24   relates to the exhibits that were offered yesterday by the

25   defense, Exhibits 3, 4 and 5.  There was also a motion and

1    order to seal that was offered with those exhibits.  These

2    are the proprietary contracts between GM, DaimlerChrysler and

3    BMW, and we would just ask that the Court sign the motion and

4    order to seal those.

5          THE COURT:  Well, I didn't file -- these weren't

6    filed, we said we would keep them in our file, but I'm done

7    with those, I can give those back to you now.  There is no

8    need for me to keep them.  I have already reviewed parts of

9    them and used it so if you want those I guess they go back to

10   you.

11         MR. EAMAN:  Judge, Frank Eaman for Mr. Qin.  My

12   understanding was that the documents submitted with a

13   proposed order to seal would be kept in the Court's

14   sentencing file as a confidential Court exhibit and not

15   placed in the public file, and that the order to seal is

16   therefore unnecessary.  That is also true with the

17   defendant's confidential sentencing memorandum, and it is

18   also true with the final version of the presentence report.

19   I think that obviates that.

20         Referring to the matters on the record that were

21   filed confidentially, I'm going to do that, the Government

22   has already done that in their sentencing memo when they

23   referred to Ms. Du's records that were filed under seal, so

24   I'm surprised that they are standing up today to ask the

25   Court's permission to do something that they have already

1    done.  I think we can discuss those in court, I have no

2    objection to that, it is just that they shouldn't be made

3    part of a public record just as the presentence report should

4    not because it is confidential information on which the Court

5    considers for sentencing.

6         THE COURT:  Let me indicate to you, I do want to

7    give these back to you and I will ask Bernie to at the end of

8    the sentencing, to come into my office because I didn't bring

9    all of that out to pick up these documents because I don't

10   need them, they are in my confidential file so nobody has

11   seen them but me but I don't want to keep them indefinitely,

12   I don't think it is necessary to do that even for purposes of

13   appeal because anything I'm going to use for the sentencing I

14   will reference it on the record.

15        MR. EAMAN:  I understand, Your Honor.  The 6th

16   Circuit has a procedure by which documents provided only to

17   the Court for sentencing purposes and the presentence report

18   can be filed as a non-public record on appeal, so that's

19   probably what will happen to all of these documents then.

20        THE COURT:  All right.

21        MS. CORKEN:  Your Honor, just so I'm clear, so the

22   contracts as well as the materials that were submitted by the

23   defense under seal will be available to the Court of Appeals,

24   they will be accepted by the Court in such a fashion that

25   they can be reviewed by the Court of Appeals if necessary?

1          THE COURT:  Well, it is my understanding you file

2     them, we never file any exhibits.

3          MR. EAMAN:  Yes.  On appeal counsel can file

4     confidential sentencing material in a confidential manner

5     with the 6th Circuit because I have done it so there is a

6     method of doing it.

7          THE COURT:  I will tell you what, I will keep

8     everything until after the appeal is complete and then give

9     you back --

10          MS. CORKEN:  Very good, Your Honor.

11          THE COURT:  -- those documents.

12          MR. EAMAN:  All right, Your Honor.

13          THE COURT:  But I will not be submitting them to

14     the Court of Appeals unless they specifically request them

15     from me.

16          MR. EAMAN:  I understand that.

17          MS. CORKEN:  All right.

18          MR. EAMAN:  Okay.  The Court deferred hearing on

19     the motion to compel disclosure of Brady materials.  Is the

20     Court intending to take this at the end of sentencing?

21          THE COURT:  I do.

22          MR. EAMAN:  Because some of that material may be

23     relevant to sentencing if the Court orders disclosure, so --

24          THE COURT:  You want to do it first, we can do it

25     first.  I'm ready to proceed on it right now.

```
 1              MR. EAMAN:  I think we should do it first.
 2              THE COURT:  Okay.
 3              MR. EAMAN:  Let me get the motion, please, Your
 4   Honor.
 5              THE COURT:  We have two motions.
 6              MR. EAMAN:  Yes.  The one about sealing records,
 7   since we are talking about sealing records maybe we can
 8   address that now too as well.
 9              Your Honor, I will start from the table here and
10   approach the podium as I talk.  We have filed a joint motion
11   for Brady materials relative to an FBI 302 interview report
12   of a witness Chris Mi.
13              THE COURT:  Wait a minute, Counsel, while I find
14   the right one.  What is the docket number on that?
15              MR. EAMAN:  I have --
16              THE COURT:  I've got it, 211.
17              MR. EAMAN:  That's -- the Government's opposition
18   is 211.
19              THE COURT:  I just want to make sure I am on the
20   right motion.  All right.
21              MR. EAMAN:  Your Honor, I will be brief.  We found
22   out through an investigator's interview, which is attached to
23   our motion, that the Government during the course of the
24   investigation of this case interviewed a witness named
25   Chris Mi.  Chris Mi's name came up during the trial.  There
```

1    was an exhibit that we introduced at trial which he

2    co-authored with Mr. Qin on hybrid cars.  The Government's

3    expert, Tom Jahns, was questioned by the Government about

4    this article, and we learned after the jury's verdict that

5    Chris Mi had been interviewed by the FBI about this article.

6         We believe that once the Government saw that

7    article on our exhibit list and that they had interviewed one

8    of the authors of that article that they were required at

9    that point to turn over the interview report.  Now, Dr. Mi

10   now can't remember what he told the FBI so our ability to get

11   the information from him is completely gone.  We don't know

12   when this interview took place, we don't know what they asked

13   him, and we don't know its contents, so at the very least the

14   Government should turn that interview report over to the

15   Court to determine whether or not it contains Brady or

16   exculpatory material, and some of that would be if Dr. Mi

17   says yes, Mr. Qin was -- did know hybrid car technology when

18   he wrote this article and he was well versed in it, because

19   as you may recall our defense in this case was that Mr. Qin

20   did not need the GM information because he knew about motor

21   control.

22        THE COURT:  Well he co-wrote the article, wasn't it

23   on the motor control?

24        MR. EAMAN:  Yes, it was on hybrid motor control.

25        THE COURT:  So what do we need Dr. Mi's --

1          MR. EAMAN:  Well, the Government expert, Tom Jahns,

2    testified that this was a rudimentary article and did not

3    display any knowledge about anything about hybrid cars except

4    the most rudimentary and basic matter.  Now, I don't know

5    what Dr. Mi told the FBI but if he told them the truth he

6    would say that Mr. Qin had great knowledge of hybrid car

7    motor control and that's why he contributed to this article

8    and was a co-collaborator.

9          THE COURT:  You didn't call him?

10         MR. EAMAN:  We didn't call him, no.

11         THE COURT:  But you introduced the article?

12         MR. EAMAN:  We introduced the article, which he

13   co-authored, which the FBI had interviewed him about, the

14   article that was our exhibit.

15         THE COURT:  And Dr. Mi -- I mean, he wrote the

16   article with him so he would have known him?

17         MR. EAMAN:  Yes.

18         THE COURT:  I'm not understanding what the

19   information is that you are seeking?

20         MR. EAMAN:  Well, the interview report of

21   Dr. Chris Mi by the FBI about the article that was an exhibit

22   that we introduced at trial.  I think if the Government sees

23   we are going to be introducing an article that was written by

24   somebody that they interviewed, that they have a duty to turn

25   over to us the interview report of the author of the exhibit

1   that we used at trial, they can't keep that secret --

2           THE COURT:  Okay.

3           MR. EAMAN:  -- because it is material.

4           THE COURT:  Mr. Martin?

5           MR. MORGAN:  I have nothing.

6           MR. MARTIN:  Yes, Your Honor.  The alleged Brady

7   material that they say that Dr. Mi has --

8           THE COURT:  And Brady says you have to turn over

9   material under what circumstances?

10          MR. MARTIN:  When it is exculpatory or impeaching

11  and when the defense doesn't already have it from another

12  source.  So, in other words, Brady does not require the

13  Government to turn over all exculpatory information the

14  Government has.  The only time the Government has to turn

15  over that exculpatory information is if the defendant doesn't

16  already have it from another source.

17          THE COURT:  Well, here is my question, let's assume

18  that Dr. Mi told you in the interview that Mr. Qin had this

19  knowledge of the hybrid vehicle, let's assume that for

20  purposes of discussion that that's true, the article itself

21  speaks for itself, so are you saying that the defense has

22  knowledge of what Dr. Mi is saying or knows or his opinion

23  because Mr. Qin and Dr. Mi had worked together or

24  collaborated together on this article?

25          MR. MARTIN:  My point is a little bit more precise,

1    and that is I'm focusing on if the exculpatory information is

2    that Defendant Qin has knowledge of hybrid vehicles, my point

3    is that Defendant Qin, more than anybody else in the world,

4    already knows what his knowledge of hybrid vehicles is such

5    that he could make use of that in an exculpatory way at

6    trial, which he did by introducing the article.  So if what

7    they wanted to do was call Dr. Mi to say Defendant Qin has

8    knowledge of hybrid vehicles, well, Defendant Qin knows his

9    knowledge of hybrid vehicles, so they know the exculpatory

10   information already and they know the source of it because he

11   has worked with Dr. Mi -- the Defendant Qin has worked with

12   Dr. Mi for over a decade.  You know, this article goes all

13   the way back to 2001.  Dr. Mi was on the defense witness list

14   that they supplied to the Government before trial.  They knew

15   who Dr. Mi was.  Dr. Mi has even submitted a letter to the

16   Court on behalf of Defendant Qin for sentencing.  I mean,

17   he's clearly in their camp.

18          There was no question that they already knew the

19   alleged exculpatory information and they already knew the

20   source of it because they were planning, if you were to go by

21   their witness list, to call him as a witness at trial, which

22   they declined to do ultimately because I think they made

23   their point with the article.  The article was a way to make

24   the point to the jury that Defendant Qin had hybrid vehicle

25   information, which gets to my last point about Brady, and

1    that is that there can be no Brady violation if the
2    information would not have likely changed the outcome of the
3    trial.  And given that they made this point already to the
4    jury through the article, simply calling another witness to
5    say that Defendant Qin has knowledge of hybrid vehicles was
6    not likely to change the outcome of the trial.  I mean, this
7    was a very -- a relatively small point in the trial, so for
8    those reasons I think the motion should be denied.  Thank
9    you.
10           THE COURT:  All right.  Reply?
11           MR. EAMAN:  I listened very carefully to what
12   Mr. Martin said, and I've always listened to what he said in
13   this court and I have reviewed transcripts and things he said
14   in other courts and sometimes I find that I have to read
15   between the lines to really hear what Mr. Martin is saying.
16   And when I read between the lines to what he just said, what
17   he said was that the 302s do contain exculpatory information
18   but that they don't have to turn them over because we have
19   another means of finding that exculpatory information, but
20   what he didn't address is whether or not those 302s could
21   have been used to impeach their expert, Tom Jahns, who gave
22   an opinion about the knowledge in this article, and certainly
23   an interview of one of the authors of the article is a basis
24   for which -- that the expert could be cross examined as to
25   whether in giving an opinion of this article he has seen the

1    interview of one of the co-authors.

2            THE COURT:  Okay.

3            MR. EAMAN:  So I believe we are entitled to it.

4            THE COURT:  I truly fail to see how this is Brady

5    material or Rule 16 material.  This witness is a witness who

6    was on the defendants' witness list that collaborated with

7    the defendant in writing an article in 2001.  The article was

8    introduced into evidence.  The fact that another witness said

9    it was rudimentary is a comment on the value of the article

10   and you could have a battle of experts, but it was

11   defendants' choice not to present Dr. Mi.  Certainly if he

12   was on their list one would anticipate that they knew what

13   Dr. Mi was going to say so clearly this information was

14   available to the defendant.  It was not impeaching

15   information.  It wasn't any more exculpatory than the

16   article -- could not have been than the article itself, but

17   as to the quality of the article and what it meant this would

18   have made no difference.  There is no Brady violation since

19   it would have made no difference in this trial, so the motion

20   is denied.

21           Let's talk about the protective-order motion then.

22           MR. EAMAN:  Thank you, Your Honor.

23           THE COURT:  It seems like there is some

24   misunderstanding as I read your reply and I don't know how

25   much of this is left.

1          MR. EAMAN:  I'm only asking for two things here,

2    one is to be alleviated from keeping the discovery material

3    under lock and key.

4          THE COURT:  What does that mean exactly, so anybody

5    could see it?

6          MR. EAMAN:  No, it would be in my office, anybody

7    cannot see it.  I just have to have a separate drawer -- I

8    had to buy a file cabinet with a locking drawer that worked,

9    we had one that didn't work, to keep this discovery material,

10   and every time we take it out and look at it we have to put

11   it back in and lock it in a drawer.  That's what I'm asking

12   to be alleviated from.  I will keep it in my office, I will

13   not release it to third parties, and it will be accorded the

14   same protection as all of my other files in my office that

15   are maintained in a private fashion.  I just would like to be

16   alleviated of the lock and key provision of the discovery

17   material.  That's one thing I'm asking for.

18          The other thing I'm asking for is to return to the

19   defendants copies of documents taken from their home.

20          THE COURT:  These are the seven boxes that you are

21   talking about?

22          MR. EAMAN:  Correct, the seven boxes that take up

23   in my instance probably about 15 to 20 percent of the storage

24   area I have because I have a limited storage area.  There are

25   no trade secrets, there are no GM documents, there's nothing

1    in these documents, they are the business records of the

2    defendants' companies and that's all they are, and the

3    Government has the originals of these documents, these are

4    only copies, and I think they should be returned to the

5    defendants.

6              THE COURT:  Okay.

7              MR. EAMAN:  That's really all I'm asking for.  I'm

8    basing the no lock and key -- I sent in Exhibits 3, 4 and 5

9    to the Court for sentencing, and if you look carefully in

10   that, and I can refer to the page number if you want, there

11   is a paragraph in every one that says that DaimlerChrysler

12   and BMW only have to keep that material confidential for five

13   years.  And none of the -- the information that the

14   defendants had, of course, was only current through 2005 when

15   Du left the company so there couldn't be any information

16   which they possess which has been turned over in discovery

17   that has been given to DaimlerChrysler or anybody else after

18   2005, so in 2010 the confidentiality expired by virtue of

19   contract so to require me to keep it under lock and key, you

20   know, seems unnecessary.

21             MS. CORKEN:  Your Honor, we would ask with respect

22   to the protective order that was entered after the

23   indictment, and that pertains to the discovery material, that

24   the provisions continue to be in force and in full.  The lock

25   and key provision that Mr. Eaman refers to is a minimum

1    safeguard for technology that is extremely valuable to GM.

2    It is unclear what the hardship is in keeping material that

3    has been maintained by the defense for a number of years now

4    in a locked cabinet or a locked drawer.  We don't know who

5    has access to the -- to Mr. Eaman's office but given the

6    nature of the information and how valuable it is that minimal

7    requirement that it be maintained in a --

8            THE COURT:  What about the argument that counsel

9    made as to the license agreement and the five years?

10           MS. CORKEN:  Yeah, in all honesty I find that

11   argument a little scary because this is a provision that -- a

12   contractual provision that existed between GM and

13   DaimlerChrysler, and it did provide that DaimlerChrysler was

14   contractually bound to keep the information confidential for

15   a period of five years, that is until 2010 or so.  That

16   provision, it does not mean that after 2010 the information

17   belongs to the defendant -- defendants, it doesn't mean that

18   after 2010 the technology is now public and anyone can have

19   it, it doesn't mean that GM after 2010 did not consider the

20   technology confidential.  You heard at trial that the

21   information is still considered confidential to this day, it

22   is still employed in GM hybrid vehicles, and it certainly

23   doesn't mean that DaimlerChrysler or BMW has made the

24   information public or treats it anything other than

25   confidential, they paid millions of dollars for the

1   technology.  So that argument that, well, there was this

2   contractual provision between these two parties and therefore

3   the information is -- should be freely available and

4   accessible to everyone just doesn't make sense.

5           THE COURT:  Okay.

6           MS. CORKEN:  Your Honor, with respect to the

7   hard-copy documents that were provided to the defense as part

8   of the taint review, it is not accurate that those materials

9   are entirely the defendants' material.  There are materials

10  of GM, one of the trade secret documents was recovered in the

11  search warrant.  Second, there are documents that belong

12  to -- confidential documents that belong to Controlled Power,

13  and the protective order that was entered was for the

14  purposes, as it states explicitly, of protecting not only the

15  confidential information of GM but the confidential

16  information of Controlled Power Company as well.  Just

17  looking at the index to the search materials that I have been

18  provided by the FBI, there is an item of blueprints from

19  Controlled Power Company, miscellaneous documents relating to

20  Controlled Power Company, so those documents do not in toto

21  belong to defense.

22           What we suggest in our reply it seems to me is a

23  very reasonable way of approaching this issue, and that is

24  the defense provide back to the Government what was provided

25  to them solely for the purposes of taint review but we will

1   review those documents and we will provide back to the

2   defense once we have reviewed them documents that exclusively

3   belong to the defendants and their companies, and we can put

4   to one side those documents that we don't think belong to the

5   defendants or their companies and the defense can review what

6   we have decided shouldn't go back to them, so it is all very

7   transparent, but in that way the documents that do belong to

8   the defendants are returned to them and yet the proprietary

9   interest of both GM and Controlled Power Company are

10  respected.

11          THE COURT:  All right.

12          MR. EAMAN:  I believe all the files in my office

13  are safe and secure from public scrutiny whether they are

14  under lock and key or not.  Our office is locked sometimes

15  during normal business hours to make sure -- we have staff in

16  the office to make sure that things are protected.  I don't

17  know why I have to lock up documents in my file cabinet that

18  in 2010 were found by General Motors not to have the

19  protection of confidentiality.  I just think it is silly, and

20  I hope I'm alleviated at least from that burden on me.

21          As to the documents that were taken from their

22  house, yes, there was one document in there that was charged

23  as a trade secret in the indictment, it was the oil pump

24  schematic, but as the Court is aware that was dropped from

25  the indictment as a trade secret, and every single witness

1   who testified testified that that is not a trade secret,

2   including the General Motors engineers --

3          THE COURT:  Okay.

4          MR. EAMAN:  -- so that's the only document.

5          As to protecting Controlled Power's materials here,

6   first of all, there is a protective order in the civil case

7   which prevents any party from sharing any materials with

8   anybody else, so all the Controlled Power documents in there

9   are already protected by a protective order in the civil case

10  and nobody can disclose that.  I can't, Mr. Qin or Ms. Du

11  can't, no one can.  And third, the Government is not the

12  protector of Controlled Power; none of their technology was

13  the subject of any charges in this Court, and the Government

14  cannot now assert and say well, they shouldn't have it back

15  because it has Controlled Power stuff in there.  Mr. Qin

16  worked for Controlled Power, he has a right to have

17  Controlled Power documents while he worked for them, and it

18  is subject to protective order anyway so it can't be

19  disclosed to anybody else, so it is unnecessary to do

20  anything other than return those documents to Mr. Qin and

21  Ms. Du.

22         THE COURT:  All right.  I mean, this is a bogus

23  argument.  Relieve you of the burden of locking a drawer that

24  I don't know what you would do going into the drawer anyway,

25  you didn't say how many times you had to go into the filing

1   cabinet under lock and key.  I think that these materials,

2   even though they may be five years beyond the lease

3   agreements, they are still proprietary materials, they may

4   not be trade secrets but they are proprietary materials of

5   General Motors of which the defendants had no right to have

6   and those materials should be protected, and since they are

7   already under lock and key the Court is going to maintain

8   that they should stay under lock and key and after the appeal

9   is over they may be returned back to the Government.

10         As to the seven boxes of records that were

11   submitted for and went through a taint review, I agree those

12   boxes do probably take up a considerable amount of space but

13   they may be, if you wish, sealed and turned over to the

14   Government to maintain in the future.  I, again, think that

15   the records of GM and the records of CPC, even though not

16   trade secrets, are proprietary and these defendants had no

17   right after their employment to keep these records and

18   therefore they should not be returned to them.  There are, I

19   would assume, documents that are strictly the defendants'

20   documents and those should be returned to them.  So my

21   suggestion is either you do this, you keep all of the boxes

22   or you turn them over to the Government to go through and to

23   return to the defendants those documents that are just

24   theirs.  It is only these things, the General Motors'

25   documents, any documents of Qin and Du that have copies of

1   the -- handwritten copies or otherwise of GM or CPC documents

2   and anything else that is not a GM or CPC document should be

3   turned over to the defendants directly.  All right.

4          MR. EAMAN:  All right.  Judge, then I will decide

5   whether I keep them or turn them over to the Government in

6   accordance with the Court's direction?

7          THE COURT:  Right.

8          MS. CORKEN:  May I just add one request?  The taint

9   review materials were provided to the defense for a very

10  specific purpose, and that purpose was to conduct the taint

11  review.  The materials provided were these documents that

12  were recovered from the search, these seven boxes, and in

13  addition, copies of the images of all of the computers that

14  were seized from the defendants' residence, the Mad Dog, the

15  Micron, all of the computer devices that the Court heard

16  about in trial and contained GM trade secret information.

17  That taint review process was completed in February of 2009,

18  that is over five years ago -- four years ago.  There is

19  absolutely no need for the defense to maintain those

20  materials.  We would ask that the Court require the defense

21  actually to return the documents to the Government, return

22  particularly the copies of the images of the computers to the

23  Government because there is no longer any defense need for

24  those materials, they do contain proprietary information and

25  trade secret information of GM in particular.

1         The defense already has in addition to what I have

2    just described all of the materials that they received in

3    discovery so I'm not depriving them -- the Government is not

4    depriving them of any material that they might need for

5    instance for appeal.  In discovery we provided to the defense

6    again another set of copies of the images of the computers

7    that were seized from the residences -- residence in addition

8    to copies of the CPC computers, Du's GM laptop, so they

9    already have -- they have two copies of the images of the

10   computers from their residence.

11        So in light of the fact that they have everything

12   and will maintain and retain everything that they need for

13   purposes of the case, we would ask that the Court require the

14   defense to return what was provided to them solely for the

15   purposes of the taint review, and then we will review the

16   hard-copy documents just as the Court has outlined and

17   provide the material that belongs to the defense back to

18   them.

19        THE COURT:  Okay.  No, the Court is not going to

20   require that.  They are kept in the defendants' office under

21   a protective order, and they may stay there if defendants so

22   wish under that order.  All right.

23        MR. EAMAN:  Ready, Your Honor?

24        THE COURT:  Yes.  Mr. Qin, please come forward.

25        MR. EAMAN:  Your Honor, I would like to start out

1    by clarifying after the Court's ruling yesterday what the

2    guideline score is for Mr. Qin.

3              THE COURT:  Yes, I would like to do that also.  For

4    Mr. Qin his total offense level would be 28 and criminal

5    history 1, so I have 78 to 97; is that correct?

6              MR. EAMAN:  That's what I thought it was, Your

7    Honor, based on the Court's ruling yesterday, yes.

8              THE COURT:  Okay.

9              MR. EAMAN:  I'm going to address to the Court and

10   sum up some of the 3553(a) factors we have addressed in two

11   sentencing memos to the Court, one in the confidential

12   sentencing memo and the other the sentencing memorandum that

13   we submitted that addressed some legal questions that are

14   applicable, and then Mr. Qin would like to address the Court

15   when I am finished.

16             THE COURT:  You may proceed first.

17             MR. EAMAN:  Thank you, Your Honor.

18             In addressing the characteristics of Mr. Qin in

19   this case, we did obtain an evaluation from Dr. Ira Schaer,

20   which we provided to the Court, and I think that the

21   evaluation is revealing in this case.  It shows the intense

22   guilt, remorse and responsibility that Mr. Qin feels in this

23   case for what happened.  It also explains in some ways

24   Mr. Qin's behavior in this case, particularly his tendency to

25   lie to cover things up, which was a defense mechanism or

1    survival mechanism he learned growing up as a young person in

2    China where he and his family were subject to severe

3    punishment and they were -- he was taught never to tell the

4    truth because it could be dangerous, and he still does that

5    and he still -- he now recognizes that.

6           But importantly Dr. Schaer indicated that he gave

7    him a psychological test called the MMPI II, and according to

8    that Mr. Qin does not display any psychopathic tendencies,

9    does not display a lack of moral conscience, and there are no

10   indications that Mr. Qin would be a threat or danger to

11   society, and that the remorse, sense of responsibility and

12   unsolicited admission to lying during the course of the

13   evaluation are extremely positive prognostic signs regarding

14   his potential for rehabilitation, and I would have to agree

15   with that.

16          This case is the longest case I have ever had.  I

17   have been practicing law 42 years in November.  I have had

18   long cases that have gone to trial, gone up on appeal, come

19   back and had a second trial, and the case hasn't lasted as

20   long as this case.  I first became involved in this case the

21   day after the execution of the search warrant on Mr. Qin's

22   house and Ms. Du's house, which was in May 2006.  We are now

23   standing before the Court in May of 2013, that's seven years

24   later.  I have been representing Mr. Qin longer than I have

25   ever represented any client, which is seven years, and during

1    that period of time I have found him to be diligent,

2    respectful and straightforward with me about this case and

3    also willing to help and discuss and do whatever is necessary

4    to assist us in this case.  I have developed a close

5    relationship with Mr. Qin over these years, and it is a

6    relationship that came through a lot of pain because this

7    case has caused a lot of pain to Mr. Qin and his family, but

8    it is a relationship that I am grateful for because to get to

9    know Mr. Qin and his intelligence and his ability as an

10   engineer was something that I was impressed with.

11           And in talking about the suffering that was caused

12   by this prosecution, there are a couple of areas which we

13   have addressed in our confidential sentencing memorandum and

14   also I want to mention to this Court.  One is the impact on

15   Mr. Qin's employment or employability.  I think Mr. Qin has

16   shown amazing resiliency in the face of this investigation

17   and indictment.  As you know, when Controlled Power found

18   this hard drive and questioned him and he lied about whether

19   or not he was the owner of MTI or MPT he lost his job at

20   Controlled Power.  After losing his job at Controlled Power,

21   however, he went out and obtained a job at General Dynamics

22   as a supervisor and he maintained that job and he did so with

23   integrity, and one of the letters that we have in our

24   sentencing packet is an engineer who worked with Mr. Qin at

25   General Dynamics who attests to his skills and ability as an

1    engineer.  General Dynamics is a defense contractor and

2    Mr. Qin worked there and passed all scrutiny and never --

3    there was never a sniff of any impropriety while he worked at

4    General Dynamics.  He'd probably still be working at General

5    Dynamics except he was indicted and after he was indicted he

6    was terminated.  As an at-will employee, that could happen.

7         What happen after he lost his job at General

8    Dynamics?  He then got a job at Lear Corporation working in

9    the hybrid car part of Lear, and as attested to by an

10   engineer at Lear, Mr. Qin displayed exceptional engineering

11   ability and was able to do some of the things related to

12   their hybrid car project that a lesser engineer was not --

13   would not be able to do, and that's a tribute to his ability

14   as an engineer.  That's what happened at Lear.

15        However, he was later fired from Lear, and we

16   believe the FBI contacted Lear, and we know we got in

17   discovery the Lear personnel file so we know there was

18   Government contact.  After being fired from Lear he got

19   another job as a consultant with a company, and he worked for

20   them for years until the guilty verdict.  After the guilty

21   verdict he was --

22        THE COURT:  What is that last company?

23        MR. EAMAN:  On The Mark it is called.  After that,

24   that employment was terminated after the guilty verdict, but

25   even now he does consulting with a company called Power Sim

1    and he's still working as an engineer, which is again a

2    testament to his ability and his ability to contribute to

3    society significantly because many of the things he has done

4    has helped many major corporations and many projects that are

5    electrical engineering projects.  But in defending against

6    this case and against Controlled Power, Mr. Qin's family's

7    life savings have been spent, and I have a little guilt about

8    that because some of them were spent to pay me attorney fees

9    and here I stand next to Mr. Qin when he's being sentenced on

10   this offense, but he did, and he was diligent about making

11   sure that his attorney-fee bills were paid and was

12   cooperative with all of his attorneys through everything.

13          But the effect of the length of time of this

14   investigation and the effect of the length of time of this

15   case, which was delayed almost a year by the Government's

16   interlocutory appeal of the Court's pretrial order, has

17   really taken its toll on Mr. Qin, not more than his wife

18   though, and I know Mr. Morgan will address this, but I have

19   seen Ms. Du when she comes to our office for joint meetings

20   and seen the effect on her as well, and that has -- that has

21   an adverse effect on Mr. Qin because it is his wife that he's

22   watched suffer for all of these years through the

23   investigation and the indictment.  So those are factors that

24   are not reflected in the guidelines but are factors of the

25   offense and also factors of Mr. Qin's characteristics as

```
 1    well.
 2            In considering -- I know the Court has read all the
 3    letters.  There is one from his mother that we inadvertently
 4    omitted and added at the end.  She's 84 years old.  Mr. Qin
 5    has been unable to visit her in China during the pendency of
 6    this case since 2010.  She has Parkinson's disease and
 7    because his passport is in the possession of Pretrial
 8    Services he's been unable to leave the country.
 9            THE COURT:  She has said that he's only visited her
10    three times.
11            MR. EAMAN:  That's right, that was during the
12    course of the investigation he went back to the country.  His
13    passport was originally seized by the Government at the time
14    of the execution of the search warrant I think.  We asked
15    Jonathan Tuckle of their office to release that passport so
16    Mr. Qin could go back to see his mother in China.  The
17    passport was released, and he did return to China to see his
18    mother, but he has been unable to do that during the pendency
19    of this case.  She is 84 and has Parkinson's disease.  How
20    much longer she will live I can't tell you.  I have had
21    family members with Parkinson's disease who have not faired
22    well, so that's all I can say.
23            Mr. Qin has contacted United Way and he would
24    engage in community service through United Way as well.
25            The bottom line to this case to me is that this was
```

1    not a crime of violence and General Motors suffered no loss,

2    and that I think are important factors for the Court to

3    consider.  We have also pointed out to the Court that

4    Mr. Qin, without previous record, and also a person who -- a

5    person who has education is extremely unlikely to be a repeat

6    offender.  The percentage for all people without a record as

7    whether they re-offend is 11.7 percent, and I would suspect

8    that some of that 11.7 percent may be drug cases where there

9    is a higher incidence of repeat offending.  So his chances of

10   repeating are small, in my opinion nonexistent as I know the

11   man because what he suffered and what he has seen his wife

12   suffer through this case is something that he would never

13   want to repeat for the rest of his life.

14          We have pointed out to the Court sentences in trade

15   secret cases.  We have a grid in our sentencing memo and

16   sentencing in trade secret cases even where the value of the

17   money -- value of the property is in the millions of dollars

18   do not tend to be on the harsh side, they tend to be on the

19   light side, and there are many probationary sentences given

20   in trade secret cases.  There are many light sentences given

21   in trade secret cases, and we have that chart on page 22 of

22   our sentencing memorandum.

23          Then there is another factor to consider here, the

24   fact that what drives the guidelines in this case is value or

25   loss, which is a monetary figure.  The cases have recognized

1    and we have cited to them in our sentencing memo that that is

2    a weak indicator of an appropriate sentence for an individual

3    offender since the value or the monetary amount is an

4    objective conclusion, and where that is done it doesn't

5    always reflect the tendencies of the person who has offended.

6    In this case I think that it does not.  The 6th Circuit has

7    recognized that, and we have cited the case McBride to the

8    court where the court imposes an economic reality test in

9    terms of where there is a loss amount that is calculated

10   based on the value of some property, the question is what is

11   the economic reality of what would have happened?  And I

12   don't think -- I think it is speculation to say that there

13   would have been any benefit or gain to Mr. Qin.  The

14   Government refused to stipulate yesterday that there was any

15   benefit or gain, but I think it is speculation to say when

16   you are sending three e-mails about putting together -- a

17   proposal together it is a long way from any economic reality

18   to actually have a venture to do something, it never got off

19   the ground at all, and the likelihood that a venture like

20   that would have gotten off the ground I think is very small,

21   and so the economic reality here is there is no evidence that

22   shows by a preponderance that Mr. Qin would have benefited in

23   any way from this, and therefore we would ask the Court to

24   apply that economic reality test that McBride applied in

25   considering the application of the sentencing guidelines.

1       I think -- I don't want to abandon any argument I

2   have already made in my sentencing memorandum, but I think

3   that pretty much is the highlights of what I wanted to say

4   today to the Court, but Mr. Qin wants to say something as

5   well.

6           THE COURT:  All right.  Mr. Qin?

7           DEFENDANT QIN:  Thank you, Your Honor.  I thank you

8   for giving me this opportunity to speak in front of you.  I

9   want you to know that this is all my fault and I want to take

10  full responsibility of it.  I am sorry this all happened yet

11  I want to apologize to the Court and I want to apologize to

12  GM for all of the trouble that I have caused.  I am ashamed

13  and a deep regret with my conduct that caused a great pain

14  and disaster to my family, my wife and my son.  That I --

15          THE COURT:  Take a minute.

16          DEFENDANT QIN:  Thank you.  I may lose my wife's

17  life forever.  That shame and guilt will stay with me for the

18  rest of my life.  Thank you.

19          MR. EAMAN:  Thank you, Your Honor.

20          THE COURT:  I do want to state that I have a victim

21  impact statement from General Motors -- a letter which I

22  consider a statement seeking the maximum allowable sentence,

23  and that letter was written by John Calabrese, vice president

24  of engineering.

25          MS. CORKEN:  Your Honor, the Government is asking

1    the Court to sentence Mr. Qin within the sentencing guideline

2    range as the Court has determined between 78 and 97 months.

3    A sentence within that range is appropriate because it

4    reflects the incredible seriousness of the defendant's

5    conduct, and before I get to that I would first like to

6    address some of the points that were raised by Mr. Eaman in

7    his allocution.

8         Mr. Eaman laid heavy emphasis on the length of this

9    case and pointed to the, quote, suffering caused by the

10   prosecution, unquote.  This is a case that began in May of

11   2006 when the FBI executed a search warrant at defendants'

12   residence.  As the Court is aware, it was shortly after that

13   that the defense demanded a taint review process.  That was a

14   process that was of no benefit to the Government, it was not

15   something the Government sought, it was not something that

16   the Government wanted, it was purely a defense request for

17   the defense benefit, and it was undertaken so that the

18   defendant -- defendants could protect their attorney-client

19   privilege.

20        In September terms were agreed upon for that taint

21   review and the taint review process, given the volume of

22   information, all of the computers that were seized, all the

23   information on those computers, that taint review process

24   took until February of 2009.  It wasn't until February of

25   2009 that FBI -- the lead FBI investigator and myself even

1    had access to the materials, we didn't see them before that

2    time, so that large chunk of time is not suffering caused by

3    the prosecution.  At any time the defense could have said we

4    don't need a taint review process, we have nothing to hide,

5    or the defendants could have owned up to their criminal

6    conduct right away and pled guilty but chose not to, and it

7    was their option not to, but at this point in time to then

8    lay the blame on the Government and to argue for probation

9    claiming that it was the Government's fault for the delay is,

10   one, inaccurate and not appropriate.  We did appeal an issue,

11   as the Court is well aware, but certainly that is not a basis

12   for treating the defendant with the extreme leniency that he

13   seeks before this Court.

14        The defendant also argues that the pendency of the

15   case and the -- his arrests, his indictment has impacted on

16   his employment.  In looking at the presentence report the

17   impact on the defendant's ability to earn a living has been I

18   would say marginal.  The defendant has been unemployed for a

19   period of I think six months over the past seven years, and

20   he currently makes more than he ever has made at his current

21   consulting job.  He also, according to the presentence

22   report, has very significant assets, I think they are almost

23   a million dollars.

24        The defendant also cites as a reason for leniency

25   that he wants to -- that he wants to visit his mother in

1    China, and the Court has already picked up on this that in

2    the past 30 years the defendant has visited his mother on

3    three occasions and it is only now when he faces sentencing

4    before the Court that he's asking the Court to take into

5    account now a desire to see his mother in fashioning a

6    sentence.

7           This defendant is, as the Court knows, very highly

8    educated, has been employed and has made a significant salary

9    for a very long period of time, and there is really no excuse

10   for the defendant's commission of these offenses.  I think

11   that there is only one motivation and that was greed, that it

12   was to ensure the success of the defendants' private

13   companies, it was to make -- it was to make a buck, that's

14   why the offenses were committed.

15          The defendant argues, well, we really didn't

16   benefit from these crimes.  Your Honor, it was simply because

17   they were caught.  As I mentioned yesterday, the MTI drive

18   was recovered on August 30th of 2005, that was within weeks

19   of the last e-mails that we saw relating to the Chery

20   venture, so the fact that the defendant did not benefit from

21   stealing the GM technology insofar as the Chery venture went

22   was simply not something under his control, it was because of

23   the fact that he did get caught.

24          Your Honor, the Court knows from hearing all the

25   evidence at trial that in addition to the theft of this

1   technology, that the defendant's conduct was punctuated by

2   multiple lies and deceit.  The defendant lied to CPC about

3   his role in MTI, about bringing his briefcase to work, he

4   surreptitiously contacted a CPC employee who also worked for

5   him at MTI to hide his briefcase.  He hid the fact that his

6   CPC laptop was at the MTI offices at the time.  He lied to

7   Mike Rovinski, the attorney for GM, you know, that GM

8   information was nowhere but on the MTI drive and it had been

9   on the CPC or it was on the CPC laptop, it was on the CPC

10  desktop, he had hand copied the source code.  And then, of

11  course, there was this whole role in the obstruction where he

12  was discarding and throwing numerous documents responsive to

13  the Grand Jury subpoenas in a dumpster.

14          The defendant I think argues that he can't help

15  lying, that he's not able to tell the truth, or so this

16  psychological evaluation I think they are claiming concludes.

17  And I think that that is just something that is belied by

18  everything the Court has learned about the defendant.  I

19  mean, he's not able to tell the truth yet he has been in

20  business and functioned for years and I think this is a

21  defendant who clearly knows right from wrong, he's not

22  compulsively lying, he's doing so for a very calculated

23  reason with a very specific end in mind and that's to conceal

24  his own criminal conduct because he didn't want to get

25  caught.

1          Your Honor, the sentence that the Government is

2    proposing is certainly appropriate in light of the

3    seriousness of the offense.  There is no question that the

4    defendant stole vital technology relating to a cutting-edge

5    product, hybrid electric vehicles.  I want to emphasize that

6    this is not outdated technology, GM continues to use this

7    technology in its hybrid vehicles, they continue to consider

8    it a trade secret, they consider that technology

9    confidential.  And they -- GM has invested many, many years

10   of research, development, labor, money in the development of

11   that technology.  The sheer quantity of what the defendant

12   stole as well is something that I think the Court should bear

13   in mind; this wasn't an isolated document or an isolated

14   item, the amount of technology that they stole was vast.

15          This technology I think was described by

16   Mr. Calabrese as the lifeblood of a company like GM, and

17   stealing technology of this kind impacts not only GM but all

18   of the families that depend on GM for their livelihood.  This

19   type of crime, stealing a company's technology, is so serious

20   because it does have such a broad potential impact not only

21   on the company that is involved but also on the employees and

22   the economy generally.

23          The defense has pointed to cases where probationary

24   sentences were given in trade secret cases, and those cases

25   are entirely distinguishable from this case.  The Yang case

1    the district court did impose probation, that was a sentence

2    that was vacated.  The Roberts case was also a probationary

3    case, and also that sentence was vacated.  The zoo case cited

4    by the defense the defendant was found not guilty of the

5    trade secret charges.  The other cases are also

6    distinguishable, the loss amounts are very much -- you know,

7    very much reduced, the defendants pled guilty, there were

8    downward departures, so many of the cases that the defendant

9    cites are not comparable to this case.

10           The Government would point instead to the Yu case,

11   which was a case in this district, it is a very recent case,

12   and it is a case involving sensitive automotive information

13   that was stolen by an employee of Ford under similar

14   circumstances where he was leaving the company, or thinking

15   of leaving the company, and he downloaded a bunch of their

16   design documents and left for China.  In that case

17   Judge Rosen sentenced a defendant to 70 months, and that is

18   the defendant who pled guilty and met with the Government on

19   several occasions and made efforts to have the information

20   that he had brought to China returned and provided to the

21   FBI.

22           In this case the defendants went to trial, unlike

23   Mr. Yu, and there has been really no acknowledgment of

24   wrongdoing.  Now, I know that this is an emotional time and

25   that Mr. Qin states that he takes full responsibility for

 1    what happened, but at least reading all of the materials that
 2    were provided with respect to his sentencing there is no
 3    indication that Mr. Qin thinks that he did anything wrong,
 4    there is no acknowledgment of his own criminal conduct, that
 5    he, in fact, committed a crime, that it was wrong to do so,
 6    and that he was -- he was -- he is in any way acknowledging
 7    his guilt for the offense.
 8            So, Your Honor, with respect to specific deterrence
 9    then we think that that is a significant fact because there
10    is no genuine acceptance of responsibility in this case.  So
11    for all of those reasons, Your Honor, we would request that
12    the Court sentences the defendant to a sentence between 78
13    and 97 months.
14            THE COURT:  Thank you.
15            MR. EAMAN:  Your Honor, may I respond to some
16    things the Government said?
17            THE COURT:  All right.
18            MR. EAMAN:  Thank you.  First of all, the Yu case
19    was completely different from this case.  The parties
20    stipulated that the value of the trade secret was
21    $50 million, which helped set the guidelines.  Second of all,
22    the parties agreed in their plea agreement that the defendant
23    took the documents, took them to China, did like a PowerPoint
24    presentation in China about all of this technology, so he
25    clearly shared it and showed it to others, that he wasn't

1    entitled to do.  It is a far different case than this case,

2    not only because of the value of the property but because of

3    what the defendant did with it.

4         The Government says they weren't caught -- they --

5    the only reason they didn't do this is because they weren't

6    caught.  I would remind the Court that Ms. Du had access to

7    General Motors' technology since 2003 or I think 2002, and

8    there is no evidence that before CPC took the hard drive

9    Mr. Qin or Ms. Du did anything with the General Motors'

10   technology beyond back it up on their own devices.  They

11   didn't show it to anybody, they didn't take it to anybody,

12   they didn't take it to China, they didn't do anything, and

13   all of their e-mail accounts have been reviewed, so this is

14   not like the Yu case.

15        Second of all, the taint review, Sheldon Light of

16   the U.S. Attorney's Office agreed that we needed a taint

17   review in this case because when they seized all of these

18   items from Mr. Qin and Ms. Du there was a lawsuit going on

19   and there was a lot of communications between their attorney

20   and the attorney-client privilege needed to be protected.

21   The Government agreed to it and drafted the protective order.

22   I disagree on how long it took.  We completed our end of it a

23   year before the Government completed their end, and those

24   dates are in pleadings that we filed in this Court, and I'm

25   not going to belabor that point.

1    In terms of owning up to his own conduct and

2    pleading guilty, this is one of the few cases I have ever had

3    in 42 years where there was no plea offer ever made, no

4    attempt to negotiate a plea, no plea discussions ever

5    initiated by the Government in any way at all.  In fact, we

6    asked to talk to the Government before there was an

7    indictment and the Government said they would talk to us

8    about the case before they indicted but they did not, they

9    indicted and arrested Mr. Qin and Ms. Du at 7:00 in the

10   morning in their house without notice to us, so I really beg

11   to differ about us being responsible for what happened in

12   this case.

13       We would have sat down with the Government, we

14   would have talked to them about this case, we would have

15   explained our defenses and everything else, but we never had

16   that opportunity.  This case was flat out indictment, trial

17   on all counts, no reduced plea, no bargains, nothing.  That's

18   what happened in this case, so I refuse to be blamed about

19   not owning up.  I think as a defense attorney I don't think I

20   have to walk my client in and plead him guilty as charged to

21   all counts in the indictment in the absence of a plea bargain

22   which drives our system and 85 percent of cases.

23       In terms of Mr. Qin or Ms. Du's assets, the Court

24   will note that many of those assets are in educational trusts

25   for their son who is graduating from college and starting

 1   medical school in a couple of months, and that's where those

 2   assets are tied up to make sure his education is paid for,

 3   they have taken care of their son, so those assets are not

 4   liquid assets that can be tapped.

 5           In terms of visiting his mother three times, I

 6   didn't visit my mother very much either until she became old,

 7   until she became ill, and then I visited my mother

 8   frequently.  Mr. Qin has not had the luxury of being able to

 9   do that here when his mother is now aging and getting infirm

10   because he's confined to this country, and if the Court

11   confines him that will be another length of time that he will

12   not be able to visit his mother.  So whatever happened in the

13   past, it is a different situation now.

14           Those are my responses to the Government's

15   comments, Your Honor.

16           THE COURT:  All right.  I know, Mr. Qin, that you

17   would rather not be here today, and you know what, me too

18   because this gives me absolutely no pleasure in having to

19   sentence you.  I think one thing that has to be stressed here

20   after all of the argument that we have had for two days is

21   this Court must accept, as you must, the jury verdict of

22   guilty, and you were, in fact, convicted of seven counts, and

23   the Court, whether there was a plea agreement or no plea

24   agreement, I don't know about that, I'm assuming what

25   Mr. Eaman said is correct, but I'm sentencing you on the

1    basis of the verdict of the jury, and in sentencing you the

2    Court has to impose a sentence that is sufficient but not

3    greater than necessary to comply with the purposes of our

4    law.  Of course, that is always a difficult decision as to

5    look at what is sufficient but not greater than necessary.

6           We are told in 3553(a), that your counsel

7    referenced, that there are a number of factors we have to

8    look at.  The first, of course, is the nature and

9    circumstances of the offense.  I think we have been talking

10   about that for two days so I'm not going to go into any great

11   detail except to tell you that I think this case is an

12   extremely serious one involving a serious crime.  Counsel

13   would say that there has been no loss because GM didn't

14   suffer -- GM, of course, differs with that but that's the

15   argument, and therefore this is not the type of crime in

16   which you should be punished and that probation would be

17   sufficient, but this crime, though it is not a crime of

18   physical harm, it is not a crime of you assaulting somebody,

19   it is not a crime of drugs, which we see here a lot, but it

20   is a crime in which our whole community, our whole economic

21   structure is a victim because these types of crime affect the

22   economy of our United States.  And I think that the Court has

23   to protect the integrity of the economic structure in

24   executing this sentence.  This is, in fact, serious.

25           There was some discussion in your sentencing memo

1    that the nature of your crime was more of you trying to help

2    your wife in her job.  I don't know, of course, because you

3    did not testify, which is fine, and I certainly don't mean to

4    imply that you should have, I'm just saying that I don't know

5    what it is that you did for your wife but certainly this

6    crime goes well beyond, as determined by the jury, of you

7    helping your wife.

8            The Court has to look also at your history and your

9    characteristics, and clearly you have a most interesting

10   history and a very tragic one when I look at it for both you

11   and your wife when you were younger and in China and the

12   persecutions that you and your families suffered.  It was

13   interesting to me that both of your mothers were university

14   professors, highly educated, so clearly -- and as your father

15   was, so clearly education was very important in your family

16   and certainly was a way for you to rise above what was

17   happening in your country.  You had great opportunities by

18   going to, as I understand it, a great university in China,

19   and then you came here and you have been here for -- what,

20   since 1984, I believe, becoming a citizen of the United

21   States, and you took advantage of the educational

22   opportunities here having obtained your master's degree and

23   studying for your doctorate degree, which I believe you are

24   almost done with except for a dissertation, so you're highly

25   educated.  I think you are brilliant.  I have listened to

1  some of these things and I have no doubt that you are

2  brilliant.  In fact, it is interesting, our prior discussion

3  about this, Dr. Mi talking about whether you knew about

4  hybrid vehicles or motor controls, and personally I think you

5  could do whatever you wanted with that information.  I think

6  the nature of this crime was simply your short-circuiting all

7  the years of research that it would take to produce a hybrid

8  motor vehicle and you did that by taking information from GM,

9  which is why I thought that the cost of development was such

10  an essential part of determining the value of this case.

11          It appeared to me that what you were doing was

12  cutting out that period of development, not that you wouldn't

13  still have to work on it in order to get this product or this

14  logic to work with whatever vehicle Chery Motors had, but you

15  saved yourself that step because there was you, we heard no

16  evidence about anybody else who may be, besides your wife,

17  who may be of your same caliber -- well, there were a couple

18  of people mentioned but basically you were the person and you

19  had anticipated that in I think it was five years you would

20  be selling approximately $6 million worth of hybrid vehicles.

21  Is this possible?  And counsel asked me to use the economic

22  reality test.  Well, it seems unlikely but I can't really

23  judge whether that would be possible or not.  That was in

24  your mind and that, probably more that anything, convinced me

25  as to why you took this information because you simply -- you

 1    didn't have the time to develop all of this.

 2              I note today also in looking at your

 3    characteristics that -- I mean, certainly you appear to be

 4    outside of this very tragic criminal indiscretion a person of

 5    high integrity, of brilliance, a family man who as I

 6    understand from all of the letters that you worked so many

 7    hours that you didn't -- and from your letter that you didn't

 8    have the time to give to your family that you wanted to

 9    because of your work, and that's unfortunate.  You raised a

10    son.  We know your son is also very brilliant, which is no

11    surprise given you and your wife's history, and the Court has

12    had a lot of information on your son and I think that you

13    have contributed greatly to his upbringing and your wife has

14    certainly done the majority of the parenting from the

15    letters, but both of you put education primarily because I'm

16    glad your son is in a good spot now for the difficulties you

17    are facing.  There is one thing about this passage of time,

18    and that is that your son is older and able to be

19    independent.

20              Now, I believe -- I don't know why I write these, I

21    never end up reading them, but I certainly believe that you

22    have suffered greatly in these years.  I have no doubt of

23    that.  I think that you are being sincere in what you said

24    and I certainly think that your counsel is being sincere in

25    relaying to the Court your suffering since 2006.  I don't

1    blame the Government for that, the wrongdoing was yours, not

2    the Government, but it has taken a long time.  You have

3    suffered greatly in terms of your physical toll it has taken

4    on you, and in terms of your job.  Obviously you are so

5    bright you are able to still be in need regardless of this

6    charge, and that's wonderful, you still have a great ability

7    to gain employment and work in the community, but I am sure

8    your employability and where you would be in this world is

9    diminished greatly, is diminished greatly by what happened

10   here.

11           So the Court recognizes that, and I recognize that

12   there was some delay here.  I know that there was the appeal

13   that we were all set, I think it was the day before we were

14   to start trial, and I know that you specifically had asked to

15   hurry up the trial date because of this toll and that trial

16   date unfortunately had to be delayed I think it was almost a

17   year, so the Court does consider in its sentencing the fact

18   that this has taken a tremendous toll over the six years or

19   seven years that it has been going on.

20           The Court has to look at other factors also, that

21   is the sentence has to reflect the seriousness of the

22   offense.  In other words, you can't do this, and I don't care

23   what the excuses are, there is the conviction, you cannot

24   just walk away from this because you have to know that there

25   is a harsh remedy to -- a harsh punishment for this and

1    the -- those who might do the similar things as you did have

2    to know that there is a harsh punishment.

3            We do need to offer some protection to the public.

4    Now, I don't think you are going to do this again.  I

5    disagree totally with the sentencing memorandum of the

6    Government who talks about recidivism and your ability to

7    repeat this offense.  Certainly you have the ability if you

8    work someplace to repeat the offense, but I don't believe

9    that you are going to.  I think your history is one that

10   shows me this is wrong what you did but it is not the normal

11   nature, that's not how you normally would operate, so I don't

12   think there is any likelihood here of recidivism.

13           There is a great concern about acknowledging

14   whether there is wrong, and I know the big issue here is

15   whether it was a trade secret.  What bothers me a lot about

16   this is you had to know all of this was proprietary, forget

17   if it was a, quote/unquote, trade secret, this was

18   information that GM went to great -- took great effort to

19   protect, and your wife had to sign these documents every year

20   and computers were locked, et cetera, so you knew this

21   information, both the trade secrets and the non-trade

22   secrets, was information that you should not have.

23           Also in considering the sentence the Court looks at

24   things like your need for vocational training.  That's not

25   necessary in this case.  There are many kinds of sentences

1     the Court could give as your attorney already referenced and

2     showed the Court a grid of what other people have gotten in

3     other cases.  However, we do have guidelines and they give

4     the Court some guidance but the Court is still restrained by

5     this 3553 to not give a sentence that is greater than

6     necessary, and I have tried to incorporate all of the factors

7     that we have discussed.  Certainly punishment is an element

8     of the sentencing, pure punishment, deterrence is an element

9     of the sentencing, rehabilitation is an element of the

10    sentencing, and protection of society as we have discussed.

11          Considering all of these factors, pursuant to the

12    Sentencing Reform Act of 1984 and considering the guidelines

13    and the factors contained in 18 U.S.C. 3553(a), the Court

14    hereby sentences you to the custody of the United States

15    Bureau of Prisons for a period of 36 months on each count of

16    conviction.  The terms of custody are ordered to be served

17    concurrent with one another.

18          You will after that be placed on supervised release

19    for a period of one year.  It is further ordered that you

20    shall pay a special assessment of $100 on each count, which

21    is $700 total.  The Court is going to impose a fine of

22    $25,000.  The Court orders that this fine be paid within

23    30 days of the entry of judgment in this case, and the Court

24    waives the cost of imprisonment and supervision in this

25    matter.

1          Mandatory drug testing is suspended.

2          While on supervised release you shall abide by the

3    standard conditions as adopted by the United States Court for

4    the Eastern District of Michigan, and you shall comply with

5    the following special conditions:  Due to the Court's order

6    for the fine you shall make monthly installment payments on

7    any remaining balance of the fine at a rate and schedule

8    recommended by the Probation Department, approved by the

9    Court, and not to be paid, the monthly installments, while

10   you are in prison but when you get out of prison.

11         Thaddeus, I'm not sure of the wording of that but I

12   don't want this to be taken out of any earnings that he may

13   make in prison.

14         You shall not incur any new credit charge or open

15   additional lines of credit without the approval of the

16   probation officer unless you are in compliance with the

17   payment schedule, and you shall provide the probation officer

18   access to any requested financial information.

19         You have the right, sir, to appeal this decision

20   within ten days of today's date.

21         Now we have an issue on forfeiture.

22         MS. AOUATE:  Your Honor, if it is okay with you I

23   would like to read into the record the forfeiture portion of

24   the sentence.

25         THE COURT:  Yes.

1          MS. AOUATE:  Pursuant to 18 U.S.C. 1832, and the

2     stipulated preliminary order of forfeiture, which is docket

3     number 164 which is incorporated into these proceedings by

4     reference, the defendant shall forfeit to the United States

5     the following property that was used or intended to be used

6     to commit or facilitate the commission of the defendant's

7     offense:  $279,406.50 in U.S. currency in lieu of the real

8     property located at 4905 Davis Court, Troy, Michigan.  I have

9     provided this language to the case manager in advance for

10    inclusion in the judgment.

11         THE COURT:  It will be.

12         And, Mr. Qin, I want to say this to you, that I

13    know this is difficult to look forward to but I think and I

14    hope that you will look at it in a fashion that will allow

15    you to serve your sentence and then be done with it so that

16    you can put it aside.  You have a great ability, you have a

17    great life to live, and I don't think that you should let

18    this destroy your life.  I know -- I just can't image the

19    impact that it has had.

20         DEFENDANT QIN:  Thank you.

21         THE COURT:  But I'm saying to you, you are going to

22    pay a punishment, you are going to do that, and then once you

23    do that you can say I paid my debt to society basically for

24    what I have done and go on with your life because -- you are

25    in your mid 50s, I know this -- maybe not.  How old are you?

1          DEFENDANT QIN:  52.

2          MR. EAMAN:  52, Your Honor.

3          THE COURT:  52, so you will come out and you are

4  still going to be in the prime of your life and you have so

5  much to offer, so I really sincerely hope that you can do

6  this, set it aside and then get rid of it.

7          DEFENDANT QIN:  Thank you very much.

8          THE COURT:  Good luck to you, sir.

9          MR. EAMAN:  Your Honor --

10          THE COURT:  Counsel, is there anything else?  Yes,

11  go ahead.

12          MR. EAMAN:  The Pretrial Services recommended self

13  surrender and I assume the Court was going to go along with

14  that recommendation?

15          THE COURT:  Any objections to that?

16          MS. CORKEN:  No, Your Honor.

17          THE COURT:  Yes, I will go along with the

18  recommendation.

19          MR. EAMAN:  And as it relates to self surrender,

20  Your Honor, their son graduates from college on June 21st,

21  and if the self surrender date conflicts with that we are

22  going to ask for an extension.

23          THE COURT:  Absolutely.

24          MR. EAMAN:  Thank you.  And at the conclusion of

25  sentencing --

1          THE COURT:  I was thinking one other thing, is your

2    son coming home before he goes to medical school?

3          DEFENDANT QIN:  Yes.

4          THE COURT:  How long will he be home?

5          DEFENDANT QIN:  He will be home until August.

6          THE COURT:  Until August.  Okay.  You may file a

7    motion to put off the self surrender until August.

8          MR. EAMAN:  Thank you, Your Honor.

9          DEFENDANT QIN:  Thank you.

10         MR. EAMAN:  Your Honor, at the conclusion of

11   sentencing proceedings the Court is supposed to give counsel

12   an opportunity to articulate objections on the record.

13         THE COURT:  Yes.  Let me ask the Government first

14   as to the objections.

15         MS. CORKEN:  None that the Government has not

16   stated already, Your Honor.

17         THE COURT:  Defendant?

18         MR. EAMAN:  Our objections relate to the Court's

19   finding of the loss yesterday.  We don't think the Court's

20   findings are adequate for review.  We think the Court should

21   have held an evidentiary hearing to resolve the question of

22   value of loss, and we don't think the Court delineated what

23   portion of the loss it found was applicable to trade secrets

24   as opposed to other conduct, that there was no finding of

25   subjective intent for the intended loss, and we don't

```
 1    believe, as I think we have already stated, the cost of
 2    development is -- we don't think is legally available in this
 3    case and is not a good method for calculating loss.  Those
 4    are our objections if they haven't already been articulated.
 5              THE COURT:  Okay.  Thank you.
 6              MR. EAMAN:  Thank you, Your Honor.
 7              THE COURT:  All right.  Ms. Du, Mr. Morgan?
 8              MR. MORGAN:  Thank you, Your Honor.
 9              THE COURT:  Let's also start, because there has
10    been a reduction I would like to go over the guidelines, and
11    that is again they are -- a total offense level 28, so the
12    guidelines are 78 to 97 months.  You agree with that?
13              MR. MORGAN:  Yes, Your Honor.
14              THE COURT:  All right.  Ms. Du, did you review this
15    present investigation report with your attorney?
16              DEFENDANT DU:  Yes.
17              THE COURT:  Okay.  And we have gone over the
18    objections --
19              MR. MORGAN:  We have.
20              THE COURT:  -- yesterday?
21              Before the Court passes sentence who wishes to
22    speak first, Ms. Du or you?
23              MR. MORGAN:  I would like to speak first.
24              THE COURT:  Okay.
25              MR. MORGAN:  If I may.
```

```
 1           THE COURT:  Go ahead.
 2           MR. MORGAN:  Judge, in May of 2010 the Attorney
 3   General, Eric Holder, issued a memorandum to all federal
 4   prosecutors regarding the subject of charging and sentencing
 5   positions and decisions, and a portion of that memo the
 6   Attorney General uses the phrase equal justice depends on
 7   individualized justice, and elsewhere commends federal
 8   prosecutors everywhere to take into account an individualized
 9   assessment of the defendant's conduct, which obviously
10   includes the defendant's individual circumstances, the
11   individual background, and in essence perhaps the Attorney
12   General is really articulating what is already embodied in
13   the statute the Court is well familiar with, Section 3553.
14           Now, we offered Dr. Miller's report and
15   Ms. Schaefer's report not as an excuse, there is no excuse.
16   Ms. Du was the General Motors' employee.  Ms. Du violated the
17   trust of General Motors.  Ms. Du has been convicted by the
18   jury.  I would submit to the Court that Ms. Du and Mr. Qin
19   are not fungible.  She does not have resilience, amazing or
20   otherwise, and that is well evident from the sentencing
21   submission.
22           I think they should be distinguished, the jury
23   distinguished them, the jury distinguished Ms. Du acquitting
24   her of what I might characterize as the Chery Motor wire
25   fraud counts, and I think that's significant here.  Both
```

1      Mrs. Schaefer and Dr. Miller explored in detail the cultural

2      aspect of her life, of her marriage, and I think there is

3      little question that she was subservient to her husband,

4      unassertive, submissive to his will, and I don't stand here

5      obviously to criticize Ms. Du but these are the realities of

6      her personal circumstances.

7              I don't think they can minimize in any sense the

8      mental health issues.  I don't think you can fairly minimize

9      them as self-serving.  I don't think that you can suggest

10     that they are an exaggeration of normal anxiety.  I think all

11     of the reports when taken in total contradict that.  And the

12     Court may recall on October 28th, 2010 Ms. Du appeared

13     without her husband -- or I did on her behalf appeared for a

14     special status conference, and that was a status conference

15     that concerned the subject of her mental competency, and that

16     was not initiated by Ms. Du.  In fact, Ms. Du at the time

17     felt humiliated.  In any event, that was initiated by the

18     Government.  I can't help but think that it was initiated in

19     part by the Government's observation of Ms. Du as she sat

20     shaking in the duty court nearly hysterical at the day of the

21     arraignment or second arrest.

22             Now, I think the circumstances that are articulated

23     by Dr. Miller and Mrs. Schaefer -- well, the Government uses

24     the phrase, you know, normal case, normal anxiety.  I don't

25     know if there is anything normal about this case, Judge.  I

1  do know and the Court has already noted the stresses that

2  have been imposed upon her.  I do know the difficulty she has

3  had in attempting to cope with those stresses, and they

4  included -- obviously they begin not even in May of 2006 but

5  begin in August 2005 where CPC employees come unannounced

6  with her husband who is fired, within two weeks she and her

7  husband are sued for multiple millions of dollars, a lawsuit

8  that's still pending, and I have no reason to believe that

9  the stay will not be lifted now.  Circumstances that included

10  the loss of her buyout, the death of a parent, seizures of

11  property, shunned by former friends, a list of collateral

12  consequences, if you will, that when combined with the

13  pressure of this not normal case I think are staggering, and

14  I agree with what Mrs. Schaefer suggested that in and of

15  itself is a form of punishment.

16          I submit to the Court that Dr. Miller's evaluation

17  was thorough, comprehensive, it included various recognized

18  standard tests, the Beck's Depression Inventory, it included

19  his assessment that she was not engaging in self-serving

20  material misrepresentation.  And he obviously concluded she

21  does suffer from extreme depression.  She has a major

22  depressive disorder.  She is -- in both Dr. Miller's report

23  and elsewhere, there is a preoccupation with death and

24  suicide and hopelessness.

25          Both Dr. Miller and Mrs. Schaefer delved into her

1    background as a child and there was nothing normal about

2    that, and obviously as a child subjected to the trauma, the

3    chaos, separated from her parents, public humiliations, the

4    shaming, the struggles, and all of that, and I don't know how

5    we ever assess frankly what kind of indelible mark that

6    leaves on anybody, whether they are able to get an education

7    or not, and Dr. Miller concludes that Ms. Du does present

8    with posttraumatic stress.

9            I can tell you that in May, although I admit I

10   didn't really comprehend all that she was saying, but in May

11   when she was first arrested Ms. Du in the marshal's lockup

12   was hysterical and spoke of the events of her childhood, the

13   ransacking of her home and actually said that she

14   participated in that, if you can believe that, because the

15   guards searching the home were breaking records because those

16   were western so she broke records.  I don't know how we

17   assess this but it is obviously a lifelong and enduring

18   circumstance, and it is not her doing as has been suggested.

19   It is not of her own making.  The depression and her

20   inability to be assertive I don't think are of her own making

21   anymore than the cancer that she suffered in 2009 was of her

22   own making or her currently reduced immune system.  The fact

23   within the last week and-a-half she currently has shingles,

24   I'm not sure if the Court is familiar with that, it is

25   incredibly painful.

1    I don't mean to retrench but in what seems like a

2    prior lifetime I was an assistant prosecutor in Recorder's

3    Court, assigned to one particular courtroom, and the

4    courtroom and the judge of that courtroom earned a reputation

5    for imposing serious, lengthy prison sentences.  And that

6    judge had the appellation in front of her name, who is known

7    in the legal community, a mean, mean, and then that judge's

8    name.  But there were times and there were instances when she

9    imposed sentences that were completely contrary to that

10   reputation, totally contrary.  And I remember that judge

11   saying that people sentenced themselves, and sometimes people

12   impose sentences on themselves which is an adequate

13   punishment, and some people are punished by the process.  I'm

14   not here to stand and blame the Government or otherwise, but

15   it has been a lengthy and for Ms. Du an extremely difficult

16   process obviously.

17        I think the suggestion that Ms. Du personally is a

18   recidivist is fanciful and totally unrealistic.  I doubt she

19   will ever been employed as an engineer.  She does not have

20   the resiliency or the resolve or the strength of her husband,

21   and I think that's the reality and that reality is not all of

22   her own making, and we simply ask the Court to consider all

23   of those circumstances.

24        THE COURT:  All right.  Ms. Du, do you wish to say

25   something?  Ms. Du?

1          DEFENDANT DU:  Yes.

2          THE COURT:  Okay.  Take your time.  Why don't you

3     come in front of the microphone.

4          DEFENDANT DU:  Judge, I'm very, very sorry.

5          THE COURT:  Excuse me.

6          DEFENDANT DU:  Judge, I'm very, very sorry.  I had

7     made poor decision.  I wish I could have done differently for

8     this everything, and this is seven years I have been so

9     painful.  At that time my son only 12, he's 19 now.  So when

10    these thing happened lost friends, he don't have anybody, and

11    our house nobody comes to during the holiday.  He always

12    gathering his 26 stuff animals for guest and give them each a

13    piece of card for present.  When I saw this I so hurt.  I

14    want him to have a normal life so I devoted all of my energy

15    to him.  Every day I tried to work with him to do schoolwork

16    plus play piano and other things.  I taught him to play

17    basketball, to swim even though I'm not very good at that.  I

18    just smiled to him all the time because he was so afraid.  I

19    just wanted to ensure him everything is fine.  It is not his

20    fault, he does not do anything.  I want him to have normal

21    life.  Sorry again I made wrong decision that caused me this

22    suffering.  I'm so sorry.  I'm sorry.

23         THE COURT:  All right.  Government?

24         MS. CORKEN:  Yes, Your Honor.  Your Honor, what I

25    think is troubling with respect to both the materials that

1    were submitted to the Court and with respect to in large part

2    Mr. Morgan's allocution is that there is a clear attempt to

3    appeal to the Court's sympathy and while, of course, it is

4    natural to feel sympathetic toward a defendant in these

5    circumstances it is not appropriate to fashion a sentence

6    based on sympathy.

7            And I want to discuss some of what is raised by the

8    defense because it would be the Government's position that

9    some of what is said is not accurate, is unfounded or

10   exaggerated, grossly exaggerated in some instances.  I want

11   to take, for example, Mr. Morgan's claim that the defendant

12   is subservient and submissive to the will of her husband.

13   That is a clear appeal to a negative stereotype in the hopes

14   of engendering sympathy from the Court.  This Court knows

15   that there were many facts, that there was evidence submitted

16   in the trial that contradicts that characterization.

17           This is a defendant who is highly educated, who has

18   an undergraduate degree, not one but two master's degrees,

19   one of her resumes says she too has completed her course for

20   a doctorate.  She has worked full-time for almost 20 years as

21   a high-level -- as a senior software engineer.  She played a

22   full, active role in the business with her husband, she was

23   his business partner, they were running that company

24   together.  You heard during trial that Ms. Du brought a tape

25   recorder to an interview that she had with her boss's boss, a

1    discussion about her severance agreement, that's hardly the

2    character of somebody who is submissive and subservient.  She

3    herself engineered the effort to retrieve the Qin laptop from

4    MTI by calling and arranging for Huang Ying, a friend of

5    hers, to retrieve it so that no one would know that the Qin

6    laptop was at MTI at the time, and she, of course, had her

7    own role in assisting with the obstruction of justice.  So I

8    think all of those factors do belie a claim that Ms. Du is

9    somehow deserving of probation because she simply was

10   following the will of her husband.

11       Second, I want to spend a little time on the claim

12   that she should receive probation because of her mental

13   health issues.  I think that the Court should carefully

14   scrutinize that claim, and here is why.  The forensic

15   psychologist states that he concludes that Ms. Du has

16   posttraumatic stress disease revisited, and that it was the

17   FBI search and arrest that were experienced by Ms. Du, and I

18   quote, as a virtual flashback of her earlier shock and

19   consequence of her and her family's ordeal during and after

20   the travails (phonetic) of the cultural revolution, and he

21   concludes that she presents with PTSD from her traumatic past

22   in China.

23       That conclusion I would submit is suspect, and here

24   is why.  In July of 2010 -- from July of 2010 through

25   September of 2010 the defendant received counseling through

1    Eastwood and through Pretrial Services, she attended

2    counseling sessions, four counseling sessions including an

3    intake interview.  The defendant did not mention one word

4    about any traumatic childhood, any association of her

5    situation with something that happened during the cultural

6    revolution 40 years ago.  She was then -- her counseling was

7    transferred to Pioneer in Sterling Heights because it was

8    closer to her home.  Thereto she had an intake interview and

9    she had I believe two counseling sessions, and thereto Ms. Du

10   said absolutely nothing about any flashbacks, any childhood

11   trauma, any association again with something that occurred in

12   her childhood.

13        And then she went to Beyond Expectation before

14   trial in December of 2011 through March of 2012 and had six

15   hours of counseling sessions there and, again, had an intake

16   interview and, again, mentioned nothing about any trauma in

17   her childhood, any flashbacks to that time period in her

18   life.

19        So I think that's very telling and also does tend

20   to cast some doubt on the conclusions reached by Dr. Miller,

21   but in addition, Your Honor, you have letters from the

22   defendant's two sisters, you have a letter from her mother,

23   all of them make reference to Ms. Du's childhood, and not a

24   one mentions any trauma relating to the cultural revolution.

25   None of them mention anything about the severity of those --

1   that time period or the experiences in that time period that

2   Dr. Miller relates in his report.  In fact, Jiaming Du, and

3   we know about Jiaming Du about the trial and the obstruction

4   of justice aspect of it, and she states, and I quote,

5   ShanShan grew up in an educated and nice family.  Our father

6   was a chief engineer and our mother was a university

7   professor.  ShanShan was the youngest among the siblings and

8   was always treated by others nicely.  So Jiaming Du is

9   directly addressing her childhood and upbringing, and one

10  would think if the events of that childhood were that

11  traumatic that there would be some mention of those events in

12  a letter from one of her sisters or in a letter from her

13  mother.

14          The conclusions in that forensic psychologist

15  report are based entirely on Ms. Du's statements.  There was

16  one interview based on three hours of talking with Ms. Du.

17  There was no review of any records, there was no review of

18  any records from Eastwood, from Pioneer, Beyond Expectation,

19  there was no effort to corroborate anything that Ms. Du told

20  Dr. Miller, no effort to confirm or verify anything that she

21  said.  I think the Court would have been well served by some

22  effort in that regard because when you drill down to what is

23  stated in that report based entirely on what Ms. Du told

24  Dr. Miller, there are self-serving statements that are

25  entirely inaccurate.  For instance, Dr. Miller states, I'm

1    going to quote on page 11, she, Ms. Du, stated that at the

2    time of the interview she is not receiving psychological

3    counseling and she expressed both her willingness and

4    interest in participating in counseling in order to better

5    understand the personality issues that led to her criminal

6    conviction.

7         The interview was on February 4th, 2013.  The Court

8    has the records from the -- from Beyond Expectation.  It is,

9    according to those records -- according to those records

10   Ms. Du was, in fact, receiving counseling from Beyond

11   Expectation at the time that she told Dr. Miller that she was

12   not receiving any counseling.  She told Dr. Miller that she

13   was willing and interested in counseling, and if you read the

14   records from Beyond Expectation she has no interest in

15   counseling and treatment.  She was not cooperative.

16   Ms. Curtis mentions that she didn't seem to be serious about

17   any treatment whatsoever.

18        I'm suggesting that, Your Honor, what she was

19   saying to a forensic psychologist hired by her defense

20   attorney is suspect, that she was trying to portray her

21   situation in a way that would look most favorable to the

22   Court knowing that the Court was going to read that document.

23        There is also several pages of what Dr. Miller

24   refers to as stressors that he states contributes to the

25   defendant's mental health state.  Again, this is based

 1    entirely on what Ms. Du says.  And I want to point out

 2    several examples where what is said is not accurate.  For

 3    instance, Ms. Du told Dr. Miller, and he bases his conclusion

 4    on this statement as well as other statements of hers, that

 5    she relied on her scholarship and salary as a teaching

 6    assistant but was limited financially for many years after

 7    she entered the country.  That is just false.  The defendant

 8    and her husband entered the United States in 1984.  Mr. Qin

 9    was hired by CPC in 1985.  He was hired as the director of

10    research and development, a high-level position at CPC.  He

11    was well paid for that position.  The defendants were hardly

12    struggling in the many years after their entry into the

13    United States.

14         She says to Dr. Miller, and I quote, she had

15    nothing to do with the business of MTI.  Now, you heard the

16    evidence at trial, and that is false.  That is a statement

17    that is not accurate and upon which Dr. Miller relies on

18    his -- in formulating his conclusions.

19         And then she also states that after her husband was

20    fired from CPC in 2005 the -- their income fell dramatically,

21    and we have already talked about this, that their income did

22    not fall dramatically, that the defendant -- Defendant Qin

23    apart from six months has been employed, there was no

24    dramatic decrease in the income of Ms. Du and her husband.

25         What is more, Your Honor, the records of the

1   defendant's counseling sessions at these other facilities, at

2   Eastwood and Pioneer and Beyond Expectation, they aren't

3   consistent with Dr. Miller's conclusion.  The record from

4   Eastwood and Pioneer indicate there were a limited number of

5   counseling sessions and then the defendant and therapist both

6   agreed that there was no need for further counseling.  With

7   respect to Beyond Expectation, as I mentioned, the defendant

8   wasn't cooperative with treatment and she stopped going to

9   counseling in March of 2012.

10           Now, I think it is difficult to make an assessment

11  based on Dr. Miller's report because of the statements -- I

12  think the self-serving statements that are made by Ms. Du to

13  him.

14           The sentencing -- or excuse me.  Section 3553(a)

15  states that the sentence should provide the defendant with

16  needed medical care, but it doesn't state that you get a slap

17  on the wrist or a pass because you have mental health issues,

18  it is just the sentence of the court needs to take it into

19  account.

20           To the extent that there is an issue it is a

21  treatable -- highly-treatable issue and something that can be

22  treated within the contents -- or within the context of a

23  prison setting.  And, Your Honor, that, of course, is -- gets

24  me to the sentence that the Government is requesting of the

25  Court with respect to Ms. Du, and that is a very serious

1   sentence of imprisonment.

2        The reason that we are asking for that sentence is

3   because of the vital role that Ms. Du played in the

4   conspiracy, her essential role in stealing GM's technology

5   and her violation of the trust that GM placed in her.  Her

6   conduct also was marked by lies and concealment; her exit

7   form where she lied when she said she had returned all the GM

8   information to GM when it existed on multiple computers at

9   the time, her many lies to Mr. Rovinski about how the MTI

10  device was the only device on which there was GM information,

11  and that they -- that no other devices had GM information,

12  they didn't have current possession of GM information and, of

13  course, the role she did play in concealing both Mr. Qin's

14  CPC laptop and in the obstruction.

15       But I think what is most significant is that in the

16  materials that this defendant presents to the Court in

17  conjunction with sentencing there is yet another false

18  statement, the defendant insists to the Court that it was

19  Mr. Qin who copied the materials, the GM materials to the MTI

20  drive, that is what she maintains in her materials to the

21  Court with respect to sentencing, and that's completely

22  contradicted by the evidence at trial, not to mention her own

23  statements to Mr. Rovinski.

24       Your Honor, I'm not going to belabor all of the

25  seriousness of the offense and need for deterrence, we have

```
 1    discussed that already, but this is, as the Court has already
 2    acknowledged, a crime that is of -- that is extremely serious
 3    and does require that -- it does require that others be
 4    deterred in fashioning the sentence.  I think if the Court
 5    accepts the recommendation of the defense attorney bluntly it
 6    fails in that regard because if Ms. Du receives a sentence
 7    that is in effect a slap on the wrist companies like GM
 8    aren't going to be around.  You know, if the Court basically
 9    says you're an employee and it is okay to steal vital
10    technology worth many millions of dollars, and at the end of
11    the day if you can drag out a court proceeding you know you
12    will get away with it.  I mean, it is the worst possible
13    message that the Court could send.  Industrial espionage is
14    very real.  The threat of trade secrets particularly going to
15    companies in China is an incredibly serious threat.  The
16    sentence of the Court needs to be a strong sentence, it needs
17    to send a message that if you steal technology from a company
18    you are going to face very severe consequences, and so we ask
19    the Court send that message in addition to taking into
20    account the very serious nature of the offense in fashioning
21    a sentence.
22              THE COURT:  Thank you.
23              MR. MORGAN:  Judge, I don't want to belabor this, I
24    just want to point out that within the section, I think it is
25    F, her medical records include the Eastwood Clinic, and I'm
```

1    looking at a page from the Eastwood Clinic which was faxed

2    August 9th, 2010, and it does say at page 4 she has

3    distressing memories whenever she hears loud sounds, she has

4    recurrent nightmares and difficulty sleeping, she's confused,

5    forgetful, has difficulty concentrating and, of course,

6    that's one of the failings that the Government pointed to in

7    its sentencing memorandum, she never went out and got her

8    medical records.

9         I don't think there is any dispute whatsoever that

10   she suffered cancer in 2009, and had surgery, and that's

11   written all the way through the medical records.  But the

12   Eastwood Clinic in August of 2010, Axis I, primary

13   posttraumatic stress disorder.  Axis I, secondary major

14   depressive disorder.  I really don't think, as the Government

15   seems to suggest, that there is any disingenuousness with

16   regard to Dr. Miller's report or Ms. Schaefer's report, the

17   conclusions, the current treating psychiatrist, Dr. Patel in

18   the medical records.  I most certainly don't think that he is

19   a surrogate at this time to impose a sentence on unknown

20   Chinese espionage persons.  The Court can see what her

21   individualized circumstances are, and that's what we ask the

22   Court to take into account.

23        THE COURT:  All right.  The Court, Ms. Du, as I

24   said to your husband, it gives me no pleasure in doing this.

25   The Court is bound to accept the verdict of the jury, and at

1   sentencing we know what the sentencing guidelines are and

2   that gives us a guide of what individuals in your

3   circumstance would get, but we also know that the sentence

4   has to be individualized and we know that there are other

5   factors to consider, which we call 3553(a) factors, and that

6   part of our law tells us in sentencing that the Court should

7   impose a sentence that is sufficient but not greater than

8   necessary to comply with the purposes of our law.

9           And as I indicated to your husband, I'm not going

10  to repeat all of this because I think this is somewhat

11  consolidated, but let me say to you that the factors that

12  have to be considered include the nature and circumstances of

13  this offense, and as I have indicated, I consider this a very

14  serious crime.  It is not a crime that is assaultive or drug

15  related as we so frequently see, but it is a crime that may

16  be even more -- may be even more serious because it impacts

17  the economics and the integrity of the economics of our

18  country.  We simply cannot have people taking trade secrets

19  from here and taking them to or proposing to move them to a

20  foreign country.

21          Your memorandum -- your counsel's memorandum at

22  sentencing basically, as does your husband's comments, put

23  you as almost an innocent victim, and I say that because I

24  recognize what is being said but I want to repeat that there

25  has been a conviction in this case.

1          The -- your background in China, we heard the same

2     thing about the background of your husband, and I am assuming

3     that -- I mean, you are both from China, that there was a lot

4     of political unrest and very serious -- very serious

5     government intervention into the lives of individuals.  You

6     did have, however, a supportive family and you still have a

7     very supportive family.  You have done a lot for your son and

8     the Court notes your comments really all related to your son,

9     who is a very lucky individual to have parents such as you

10    and your husband who support him, and you indicate everything

11    that you have done for him and he indicates -- I do have a

12    letter from your son -- that all of these things are true.

13         You are highly educated as indicated with two

14    master's degrees, you had good jobs.  Why this criminal

15    deviation in your behavior I don't know.  The Government says

16    it is because of greed.  Maybe.  Is it because of

17    opportunity?  Maybe.  I'm not so sure you would know the

18    reasons why you did what you did.

19         Are you subservient to your husband?  I certainly

20    recognize that there is a different culture here, that your

21    culture is different from the culture that most of us have in

22    the United States.  I understand that perhaps you are

23    subservient but you also have very strong role models, your

24    mother being a university professor, highly educated and

25    employable people, your husband's mother, the same thing.  So

1   you may be subservient to your husband but I believe that you

2   certainly knew right from wrong and that what you were doing

3   in taking that information from General Motors was a serious

4   crime.

5          In looking at your health history, you have some

6   serious health problems, both the cancer and now the

7   shingles, but I think more importantly is your anxiety and

8   your depression.  There has been a lot of discussion by the

9   Government that the Court should not give that too much

10  weight.  Well, I do give it a fair amount of weight.  I

11  believe it, and I think that this has to be -- in fact, I

12  can't even imagine what it has been like for you in these

13  last years going through this stress for seven -- at least

14  seven years.  I know that you wanted -- I know that counsel

15  was in here, everybody wanted to move this case forward in a

16  faster way and it didn't happen.  So I am considering the

17  fact that you have been under great anxiety and depression

18  due to this case, and that this has gone on for some seven

19  years.

20         The Court has to also look at other factors, and

21  that is the sentence has to show the seriousness of this

22  offense and promote respect for the law and provide just

23  punishment.  We know that we have already talked about the

24  seriousness of the offense, and you already know there is

25  punishment associated with this crime.  The punishment has to

1    reflect what you did in order to deter others in your same

2    circumstance from committing this crime and to deter you from

3    committing these crimes in the future.

4            And I agree with your counsel, there is nothing I

5    have read or have any information that would tell me that you

6    would recommit this crime.  I don't think that recidivism is

7    something that has been shown to me.  It would go against

8    your whole background and I believe that you will not

9    recommit, so I don't think the public needs to be protected

10   from you but it probably needs to be protected from others

11   who like you would commit a crime of this nature so that if

12   others see that if they do they will be punished, and perhaps

13   this type of crime will be curtailed.

14           You certainly don't need any type of educational

15   treatment or vocational treatment, but you will need mental

16   health treatment because the Court does agree and I see that

17   you are very anxious today and very upset today, and I think

18   that you will need mental health treatment and the Court will

19   take that into consideration in its sentencing.

20           I also have to look at disparities between you and

21   what other people did, and I look at what you did and your

22   husband did.  I see you have fewer counts that you have been

23   convicted on than your husband, and also the Court looks at

24   the fact that this has gone on for such an extended period of

25   time.

1          So pursuant to the Sentencing Reform Act of 1984,

2   considering the sentencing guidelines and the factors

3   contained in 18 U.S.C. 3553(a), I hereby commit you to the

4   custody of the Bureau of Prisons for a period of 12 months

5   and 1 day on each count.  Your terms of custody are ordered

6   to be served concurrent with one another, and after that you

7   will serve a sentence of supervised release for one year.

8          You will pay a special assessment of $100 for each

9   count for a total of $300, and the Court will impose a fine

10  of $12,500.  I order that this fine be paid 30 days from

11  entry of the judgment, and the Court waives the cost of

12  imprisonment and supervision in this matter.

13         Mandatory drug testing is suspended.

14         While on supervised release you shall abide by the

15  standard conditions adopted by the United States District

16  Court for the Eastern District of Michigan, and you shall

17  comply with the following special conditions:  That is you

18  will make monthly installments on your fine while you are on

19  supervised release, not to be done while you are in prison,

20  and those amounts will be recommended by the Probation

21  Department and approved by the Court.  You shall not incur

22  any new credit charges or open additional lines of credit

23  without approval of the probation officer unless you are in

24  compliance with the payment schedule, and you shall provide

25  the probation officer with any requested financial

1    information.

2         You shall participate in a program approved by the

3    probation department for mental health counseling if

4    necessary.  You shall take all medications as prescribed by a

5    physician whose care you are under including a psychiatrist

6    in the dosage and at the times prescribed.  You shall not

7    discontinue any medications against medical advice.

8         You have ten days from today's date to appeal this

9    order and to appeal your trial.

10        I want to say to you the same thing that I have

11   said to your husband -- I forgot forfeiture.  Let's do that

12   first because that will be included in the judgment.

13        MS. AOUATE:  Thank you, Your Honor.  It is the same

14   forfeiture for this defendant as previously stated, and since

15   this is a consolidated proceeding I won't repeat it.  I did

16   provide the same language to the case manager for inclusion

17   in the judgment.

18        THE COURT:  Okay.  All right.  Ms. Du, what I want

19   to say to you is you have this great anxiety and, you know,

20   there is talk of this posttraumatic stress syndrome, you are

21   going to continue with mental healthcare, but you need to get

22   this case behind you, you need to serve this time and be done

23   with it and know that you have served the time for the

24   wrongdoing.  You have got so much going for you that you

25   really -- I don't agree with counsel that you probably will

1    never work as an engineer, I don't know why not.  You're

2    young enough to be employed and I fully expect that you will

3    be, so I hope that you can come to terms with this and when

4    you are done put it behind you.

5              Objections to the sentencing, Ms. Corken?

6              MS. CORKEN:  Yes, Your Honor.  For the record we do

7    object to the Court's reliance on the length of time that the

8    case has been pending particularly since the bulk of that

9    time is attributable to the defense's desire for a taint

10   review.  And, again, just for the record we don't believe

11   that it has the bearing that the Court gave it on the 3553

12   factors for sentencing.

13             THE COURT:  Thank you.  Counsel?

14             MR. MORGAN:  Your Honor, as a housekeeping matter,

15   I know probation forwards to the Bureau of Prisons the

16   presentence investigation.  May I ask the Court if the Court

17   could use -- employ its good offices and have probation

18   include in all the materials submitted to the Bureau of

19   Prisons Dr. Miller's report and the medical records that were

20   included in our submission?

21             THE COURT:  Yes.

22             MR. MORGAN:  Thank you.

23             THE COURT:  We will do that.  Let me ask, do you

24   join in the objection?

25             MR. MORGAN:  Yes.

```
 1                  THE COURT:  Okay.  The objections that --
 2                  MR. MORGAN:  As articulated by Mr. Eaman we do.
 3                  MR. EAMAN:  And as I went back through my notes I
 4      hope it was clear when I articulated any objection.
 5                  THE COURT:  Before you do that, let's let Ms. Du
 6      sit down please.  I think she needs to sit.
 7                  MR. EAMAN:  When I articulated my objections I was
 8      indicating that I did object to the Court's conclusion on the
 9      disputed factors that we -- to our objections to the
10      presentence report including the calculation of the
11      guidelines.  I want to make the record clear on that.  I
12      think Mr. Morgan joins in that as well.
13                  MR. MORGAN:  Yes.
14                  MR. EAMAN:  Thank you, Your Honor.
15                  THE COURT:  Okay.  Mr. Morgan, anything else?
16                  MR. MORGAN:  No, Your Honor.  Thank you.
17                  THE COURT:  I would say the same thing for Ms. Du,
18      that if she is required to report that that be put off until
19      her son returns to school in August.
20                  MR. MORGAN:  Thank you, Your Honor.
21                  THE COURT:  I do want to say to the attorneys, to
22      all of you, I think you have done a really excellent job both
23      in the prosecution and in the great detail that was involved
24      in the complexity and the nature of this case.  I would say
25      to the defense, and I really mean this, you have left no
```

```
 1   stone unturned, and I hope that your clients -- I know you're
 2   not happy with the result, at least I wouldn't expect that,
 3   but I hope that you are happy with your representation.  I
 4   think that you have raised every issue that could possibly be
 5   raised, and I don't think necessarily you need to object to
 6   the Court's rulings because I think it goes without saying
 7   when I ruled against you that that's preserved for appeal and
 8   it will be up to the Court of Appeals and, of course, you
 9   maintain your position.
10              MR. EAMAN:  Thank you, Your Honor.
11              MS. CORKEN:  Thank you, Your Honor.
12              THE COURT:  Thank you very much.
13              THE CASE MANAGER:  All rise, please.
14              (Proceedings concluded at 4:16 p.m.)
15                         —    —    —
16
17
18
19
20
21
22
23
24
25
```

*CERTIFICATION*

1

2

3          I, Robert L. Smith, Official Court Reporter of

4   the United States District Court, Eastern District of

5   Michigan, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing pages comprise a full, true and correct transcript

8   taken in the matter of [!PLAINTIFF] vs. [!DEFENDANT], Case

9   No. [!CASE NUMBER], on Wednesday, May 1, 2013.

10

11

12                          *s/Robert L. Smith*
                            _____
                            Robert L. Smith, RPR, CSR 5098
13                          Federal Official Court Reporter
                            United States District Court
14                          Eastern District of Michigan

15

16

17  Date:  05/28/2013

18  Detroit, Michigan

19

20

21

22

23

24

25